[No. AO15406. First Dist., Div. Three. May 3, 1983.]

THE STATE OF CALIFORNIA, Plaintiff and Respondent, v.
COUNTY OF SANTA CLARA et al., Defendants and Appellants.

KEVIN WALSH et al., Plaintiffs and Respondents, v.
COUNTY OF SANTA CLARA et al., Defendants and Appellants.

COUNSEL

Selby Brown, Jr., County Counsel, and Robert J. Menifee, Deputy County Counsel, for Defendants and Appellants.

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, M. Anne Jennings and Peter Van der Naillen, Deputy Attorneys General, Pillsbury, Madison & Sutro, Walter R. Allan, Vaughn R. Walker and John M. Grenfell for Plaintiffs and Respondents.

OPINION

**WHITE, P. J.**—In January 1980, respondents Kevin and Phyllis Fletcher Walsh and Walsh-Fletcher Enterprises, Inc. (hereafter Walshes) petitioned appellant County of Santa Clara (hereafter County) to place timberland they owned in the southwest corner of the County in a timberland preserve zone (hereafter TPZ). The County did not process the petition because the Walshes did not possess a county use permit to harvest the property's timber. The property met all other requirements for zoning and taxation as a TPZ under the Forest Taxation Reform Act of 1976 (FTRA). (Gov. Code, § 51110 et seq.)

At the time the petition was sought, the County had not yet adopted the procedure for placing property in a TPZ, although Government Code section 51113, subdivision (b), required local governments to adopt such procedures by March 1, 1977. In June 1980, the County passed a resolution and an ordinance requiring a property owner to obtain a use permit for commercial harvest of timber before it would grant a petition for a TPZ. In the meantime the Walshes had begun an action in Santa Clara County Superior Court seeking declaratory relief and mandamus for failure to adopt the procedures and for failure to grant their petition.

In October 1980, respondent California State Board of Forestry (hereafter State), a public agency charged with protecting the State's interest in forest resources on private land and setting adequate forest policy for this state (Pub. Resources Code, § 740), brought an action to declare the County's ordinance invalid. The State contended that the County had no right or authority under state law, specifically the FTRA, to impose the use permit requirement.

The two actions were consolidated. On cross-motions for summary judgment the position of the State and the Walshes was upheld. The trial court declared the ordinance invalid, mandated the County to zone the Walshes property a TPZ, and awarded the Walshes costs and a portion of their attorney's fees.

To understand this controversy, it is necessary to review the history of the legislation from which it arises.

In 1974, the voters of California approved a constitutional amendment which exempted from property taxation forest trees or timber.[1] Pursuant to the authority granted it by this amendment, the Legislature passed the Forest Taxation Reform Act (hereafter FTRA). (Stats. 1976, ch. 176, p. 293.) The stated purpose of the act is to protect the very valuable forest resources and timberlands of the state by encouraging prudent and responsible forest resource management. (*Id.*, at pp. 293, 294.) Briefly, the act devised a scheme requiring local governments to zone certain lands as "timberland preserve zones." A TPZ designation results in tax benefits to the landowner and restricts the uses of the parcel to those consistent with continued timber production. (Gov. Code, § 51100 et seq.)

Government Code section 51113 allows the property owner to petition the local governing body to zone his land as a timberland preserve. It also delineates the procedure the body is to follow in granting a TPZ. Subdivision

---

[1]Article XIII, section 3, provides in pertinent part: "The following are exempt from property taxation:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(j) Immature forest trees planted on lands not previously bearing merchantable timber or planted or of natural growth on lands from which the merchantable original growth timber stand to the extent of 70 percent of all trees over 16 inches in diameter has been removed. Forest trees or timber shall be considered mature at such time after 40 years from the time of planting or removal of the original timber when so declared by a majority vote of a board consisting of a representative from the State Board of Forestry, a representative from the State Board of Equalization, and the assessor of the county in which the trees are located.

"The Legislature may supersede the foregoing provisions with an alternative system or systems of taxing or exempting forest trees or timber, including a taxation system not based on property valuation. Any alternative system or systems shall provide for exemption of unharvested immature trees, shall encourage the continued use of timberlands for the production of trees for timber products, and shall provide for restricting the use of timberland to the production of timber products and compatible uses with provisions for taxation of timberland based on the restrictions. Nothing in this paragraph shall be construed to exclude timberland from the provisions of Section 8 of this article."

(c) of that section requires the body to adopt, by ordinance, ". . . a list of criteria required to be met by parcels being considered for zoning as timberland production under this section. The criteria shall not impose any requirements in addition to those [seven] listed in this subdivision and in subdivision (d) below."[2] In an article about the act, one of its drafters notes that the local government has very limited discretion in choosing these criteria. The section is drafted "so as to restrict the ability of local governments to deny petitions for TPZ status." (Unkel and Cromwell, *California's Timber Yield Tax* (1978) 6 Ecology L.Q. 831, 854.)

Nowhere in the statutory list of criteria is there a requirement that the owner must obtain a use permit for timber harvesting before qualifying for a TPZ. Nor is the local government granted authority by the statute to demand one. The County argues that the statute's requirement that the parcel be timberland implied the requirement of prior issuance of a conditional use permit.

---

[2]Section 51113, subdivisions (c) and (d), listing criteria, read as follows: "(c) On or before March 1, 1977, the board or council by ordinance shall adopt a list of criteria required to be met by parcels being considered for zoning as timberland production under this section. The criteria shall not impose any requirements in addition to those listed in this subdivision and in subdivision (d). The following shall be included in the criteria:

"(1) A map shall be prepared showing the legal description or the assessor's parcel number of the property desired to be zoned;

"(2) A plan for forest management shall be prepared or approved as to content, for the property by a registered professional forester. The plan shall provide for the eventual harvest of timber within a reasonable period of time, as determined by the preparer of the plan;

"(3) The parcel shall currently meet the timber stocking standards as set forth in Section 4561 of the Public Resources Code and the forest practice rules adopted by the State Board of Forestry for the district in which the parcel is located, or the owner must sign an agreement with the board or council to meet those stocking standards and forest practice rules by the fifth anniversary of the signing of the agreement. If the parcel is subsequently zoned as timberland production under subdivision (a), then failure to meet the stocking standards and forest practice rules within this time period provides the board or council with a ground for rezoning of the parcel pursuant to Section 51121.

"Upon the fifth anniversary of the signing of an agreement, the board shall determine whether the parcel meets the timber stocking standards in effect on the date the agreement was signed. Notwithstanding the provisions of Article 4 (commencing with Section 51130), if the parcel fails to meet the timber stocking standards, the board or council shall immediately rezone the parcel and specify a new zone for the parcel which is in conformance with the county general plan and whose primary use is other than timberland;

"(4) The parcel shall be timberland, as defined in subdivision (f) of Section 51104; and

"(5) The parcel shall be in compliance with the compatible use ordinance adopted by the board or council pursuant to Section 51111.

"(d) The criteria required by subdivision (c) may also include any or all of the following:

"(1) The land area concerned shall be in the ownership of one person, as defined in Section 38106 of the Revenue and Taxation Code, and shall be comprised of single or contiguous parcels of a certain number of acres, provided that such number required may not exceed 80 acres.

"(2) The land shall be a certain site quality class or higher under Section 434 of the Revenue and Taxation Code; provided, that the parcel shall not be required to be of the two highest site quality classes."

Section 51104, subdivision (f) defines timberland, in pertinent part, as ". . . privately owned land, . . . which is devoted to and used for growing and harvesting timber, or for growing and harvesting timber and compatible uses, . . ." The County argues that the issuance of a conditional use permit is implicit in the language of this definition because of the phrase "used for growing and harvesting timber."

The respondents do not dispute the County's right to require a use permit for commercial logging. They argue that the definition of timberland encompasses the whole cycle of a tree's life. The "growing" phase is a much longer phase than the harvesting phase. Certain trees can take as long as 70 years to reach maturity. Since the aim of the FTRA is to stimulate conservation of timberlands by providing tax incentives which promote sound forest management, the grant of a TPZ is most beneficial during the long growth phase. The tax incentive serves to discourage premature harvesting or converting valuable timberland to uses other than tree growing. The county, in fact, does not require a use permit for the "growing" of commercial timber, the period when the forest resource base is being built up.

■ In construing a statute, the fundamental goal of the court is to ascertain and give effect to the intent of the Legislature. (*People* v. *Shirokow* (1980) 26 Cal.3d 301, 306-307 [162 Cal.Rptr. 30, 605 P.2d 859].) Words must be given their usual, ordinary meaning (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]), and effect must be given to every part of the statute (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]).

■ Heeding these principles, we believe that the Legislature's elaborate statement of purpose, which prefaces the details of the FTRA, makes its intent in enacting this law certain and unambiguous. (Stats. 1976, ch. 176, p. 293.) Applying that intent to the word "grow" in the act's definition of timberland makes it clear that the Legislature intended property owners to enjoy the tax benefits during the long growing phase when they are unable to realize income on their timber. The benefits are not to apply only during the relatively brief "harvest" phase, the time during which the county could require the use permit.

Given that the plain meaning of the FTRA does not infer a use permit as a prerequisite to timberland preserve zoning, the Santa Clara County ordinance is in conflict with state law. As previously stated, Government Code section 51113, outlining the procedure by which a property owner obtains a TPZ, makes no mention of a conditional use permit as prerequisite for timberland zoning. "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with

general laws." (Cal. Const., art. XI, § 7.) The corollary to this section is that a local ordinance which does not comport with a state statute is invalid. Since the state law forbids imposing criteria not on the statutory list, the Santa Clara County conditional use requirement is invalid.

### Attorney's Fees

Following judgment in their favor, the trial court awarded the Walshes $7,500 in attorney's fees under Code of Civil Procedure section 1021.5 and Government Code section 800. It bases this award on the findings that (a) a significant benefit had been conferred on the general public; (b) the financial burdens of private enforcement are such as to make the award appropriate; (c) such fees should not in the interest of justice be paid out of recovery; and (d) the actions of the County were arbitrary and capricious. The language of this order is taken directly from the language of the two code sections.

■ A trial court has authority to award attorney's fees to the successful party in an action which has resulted in the enforcement of an important right affecting the public interest if findings a, b and c, *supra,* are made. (Code Civ. Proc, § 1021.5.) The initial problem lies in determining whether the right vindicated is sufficiently important to justify a private attorney general fee award.

As the leading case in this area notes, section 1021.5 provides no concrete standard or test for this determination. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 935 [154 Cal.Rptr. 503, 593 P.2d 200].) "In litigation concerning the application of statutorily based rights in these various fields [including zoning], past decisions suggest that in determining the 'importance' of the particular 'vindicated' right, courts should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals." (*Id.,* at p. 936.)

In the instant case, the proper application of the FTRA by each county is integral to the State's plan for protecting the valuable forest resources. Because Santa Clara County did not implement the act by the time and in the manner mandated by the statute, the Walshes, and all other timberland owners in the county, were deprived of their statutory right to the tax benefits granted by the act, a right granted only if the owner agrees to limit the use of his land to timberland production. Restriction of the use of the land is the means to sounder forest management and increased timber production, the goal of the FTRA. The right of the timberland owner to those tax benefits does bear a significant relationship to the legislative goal of the FTRA.

*Woodland Hills* also discussed the concept of "significant benefit." The court observed that, again, no precise definition of the "benefit" contemplated

by a statute under scrutiny was provided by section 1021.5. Using the language of section 1021.5 and prior authorities as guidance, the court declared, "We believe . . . that the Legislature contemplated that . . . a trial court would determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Id.*, at pp. 939-940.)

The direct, immediate beneficiaries of the trial court's decision are the timberland owners, not, we suspect, a large class of persons in Santa Clara County. The Legislature contemplated benefits redounding to the public at large in passing the FTRA. The act is "to serve the public's need for timber and other forest products, while giving consideration to the public's need for watershed protection, fisheries and wildlife, and recreational opportunities alike in this and future generations." (Stats. 1976, ch. 176, § 1, subd. (c), p. 293.) The primary way to assure the public these benefits is to grant tax benefits to the timber growers, who, without this grant, would find keeping their property in timber production financially unfeasible. The Walshes own 2,300 acres of timberland. This large parcel, together with others now eligible for timberland preserve zoning, will necessarily result in scenic and environmental benefits and a potential source of timber to the general public because the owners are restricted to uses compatible with the growing and harvesting of timber. (Gov. Code, § 51111.)

The last factor to consider is whether "the necessity and financial burden of private enforcement are such as to make the award appropriate, . . ." (Code Civ. Proc., § 1021.5, subd. (b).)[3] The County argues that Walshes had no necessity to act as private attorneys general because the state Attorney General did bring an action to enforce the FTRA.

The record shows that the State did not file its complaint for declaratory relief until October 1980. The only issue raised in its complaint was whether the County's requirement of a use permit was valid under the FTRA. The Walshes, after being denied a TPZ, filed their complaint to force the County to comply with its statutory duties nine months earlier. Their complaint galvanized the County to enact its ordinance in June 1980, three years after the statutory deadline to do so. (Gov. Code, § 51113, subd. (c).) Because they did not believe the ordinance was in line with the statute, the Walshes amended their original complaint, encouraged the State's action, and secured consolidation of the two. The Walshes, in other words, were the moving force in securing benefits which, obviously, they desired, but which the County had a statutory duty to provide for the good of the general public.

---

[3]Because the Walshes made no monetary recovery by prevailing in their suit, we need not address finding c.

The County further argues that the Walshes pursued their action not as a means of benefiting the public but for the benefits they would receive as land-owners. Any investment they made in the lawsuit would be returned to them in the form of tax savings. In *Woodland Hills,* the court, quoting *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71], explained that " 'An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." [Citation.]' " (*Id.,* at p. 941.)

The trial court fixed attorney's fees at $15,000. It ordered the County to pay half that amount, because a lumber company, with which the Walshes have a timber harvesting contract, had contributed $7,500 to the Walshes for payment of attorney's fees. *Woodland Hills* recognized that litigation by private parties may result in both public and private benefit. "[W]e believe that if the trial court concludes that plaintiffs' potential financial gain in this case is such as to warrant placing upon them a portion of the attorney fee burden, the section's broad language and the theory underlying the private attorney general concept would permit the court to shift only an appropriate portion of the fees to the losing party or parties." (*Id.,* at p. 942.)

The trial court's findings on the issue of attorney fees are, unfortunately, extremely general. It is not clear whether it would have ordered the County to pay the entire sum had there been no contribution from the lumber company, or whether it intended the division to represent the expenses on behalf of the public and the expenses which went to the Walshes' personal interest in the action. However, the trial court has traditionally had equitable discretion to determine whether attorney fees under a private attorney general theory are appropriate, if, after realistically assessing the litigation, it decides, from a practical perspective, the action served to vindicate an important right. (See *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, 938.) Only if there has been an abuse of this discretion amounting to a manifest miscarriage of justice or when the trial court has acted whimsically and awarded fees where there is no reasonable basis to do so is reversal warranted. (See *Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 836-837 [160 Cal.Rptr. 465], citing 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 242-244, at pp. 4234-4235.)

We do not believe the court abused its discretion in making the award. By their action the Walshes not only obtained a beneficial rezoning for themselves, but they also prompted Santa Clara County to enact an ordinance which both the Legislature and, indirectly, the Constitution, charged the County to enact in order to protect and preserve a natural resource vital to the whole state.

Because the Walshes qualify for attorney's fees under Code of Civil Procedure section 1021.5, it is unnecessary to discuss their rights under Government Code section 800.

The decision is affirmed.

Feinberg, J., and Barry-Deal, J., concurred.

On May 31, 1983, the opinion was modified to read as printed above.