[No. D005889. Fourth Dist., Div. One. Dec. 14, 1987.]

CALIFORNIA COMMON CAUSE et al., Plaintiffs and
Appellants, v.
JOHN F. DUFFY, as Sheriff, etc., et al., Defendants and Appellants.

COUNSEL

Gregory Marshall for Plaintiffs and Appellants.

Janet B. Houts for Defendants and Appellants.

OPINION

**KREMER, P. J.**—In this case, both sides appeal from an award of attorneys' fees pursuant to Code of Civil Procedure,[1] section 1021.5. John F. Duffy, Sheriff of San Diego County (Duffy), contends the trial court erred in awarding any attorneys' fees as well as costs to California Common Cause and individual taxpayers (collectively referred to as Taxpayers) because they failed to meet any of the statutory requirements. The Taxpayers contend the trial court abused its discretion in calculating the amount of the fee award. We conclude the attorneys' fees and costs were properly awarded but remand for recalculation of the amount.

FACTS

In January 1985, Duffy appeared at press conferences in Los Angeles and Sacramento sponsored by Crime Victims for Court Reform, a private political committee organized to encourage Chief Justice Rose Bird to resign and failing that, to encourage the public to vote against her retention. Duffy announced his support for the political committee and stated he would help distribute postcards containing a strongly-worded anti-Bird message.[2] The postcards were designed to be mailed by citizens to Bird.

---

[1] All references are to the Code of Civil Procedure unless otherwise noted.

[2] The postcards stated: "Chief Justice Bird: [¶] I want a judiciary which is fair and impartial in all of its decisions, and which protects the victim as well as the accused in crimes. As Chief Justice, you have not upheld these basic precepts of justice. You have hurt our entire judicial system through the following:

"You have repeatedly decided cases in favor of criminals over victims, which has made our entire judicial system a mockery.

"You have embroiled the Court in partisan politics, creating a bias which has no place in the judicial system.

"You have used the Supreme Court to stop the death penalty. This is an action which runs counter to the will and law of the people of California.

"You have crippled law enforcement, thus endangering the safety of all Californians.

"For these reasons, I respectfully request that you resign from your position as Chief Justice of California's Supreme Court!" (Italics omitted.)

At the bottom of the postcards, in small print, was the name of the committee (Crime Victims for Court Reform) and their address in Los Angeles.

In February 1985, Duffy directed the postcards be distributed throughout the Sheriff's Department and be prominently displayed in Sheriff's substations. He issued a memo on February 11 to all sheriff's department personnel expressing his strong support for the anti-Bird campaign, indicating the availability of the postcards and stating deputies could distribute the postcards while on duty to citizens who requested them. Duffy stated distribution of the postcards did not involve a political issue since the postcards did not mention any election, campaign, vote or ballot measure.

Due to media attention, there were numerous requests for the postcards and the supply of postcards was depleted in a matter of hours. An on-duty deputy sheriff drove to Los Angeles and picked up more postcards from the Crime Victims for Court Reform committee. Eventually, 18,000 postcards were distributed through the Sheriff's Department. At least 25 deputies while on duty and in uniform participated in distributing the cards. Duffy, with clerical help, mailed postcards to 51 people who had requested the postcards. He included a cover letter condemning Bird. He used Sheriff's Department stationery, envelopes and postage meter to mail the postcards and cover letter.

On February 15, 1985, the ACLU requested Duffy stop distribution of the postcards because it involved illegal expenditures of public monies and use of personnel in political campaigning. Duffy responded by stating distribution of the cards did not involve any prohibited political activity by on-duty personnel. He continued distribution of the postcards.

On February 19, the Taxpayers filed a complaint seeking declaratory and injunctive relief against Duffy. When Duffy did not stop distribution, the Taxpayers arranged for an ex parte appearance to seek a temporary restraining order. At the appearance on February 26, the court persuaded the parties to negotiate. As a result, Duffy agreed to not distribute any more postcards and to write a memo that same day to department personnel informing them the postcards would no longer be distributed through the department and that anyone requesting information on the judicial retention election issue should be referred to the campaign committee of one side or the other. The Taxpayers dropped their application for a temporary restraining order.

Duffy issued the agreed memorandum but listed the ACLU rather than a pro-Bird campaign organization for referral. The parties returned to court

the next day to remedy this listing. Duffy issued an amended memorandum.[3]

In early March, the Taxpayers drafted and served a set of interrogatories to establish the identities and activities of the sheriff's department employees who had distributed the postcards. Duffy refused to answer three of the questions because they were "burdensome and oppressive." The Taxpayers moved to compel answers to the interrogatories. This motion was consolidated for hearing with Duffy's demurrer to the complaint. At the hearing, the court denied the motion to compel on the basis "the Sheriff has admitted the activity complained of occurred." The court also overruled the demurrer.

Duffy then filed an answer to the complaint, specifically denying the activity complained of had occurred. The Taxpayers scheduled depositions of Duffy and one of the Doe defendants (Lieutenant John Tenwolde). Negotiations for an agreed statement of facts as a basis for cross-motions for summary judgment broke down when the sheriff refused to stipulate that employees had distributed the postcards while on duty. The depositions were taken and followed by a short series of interrogatories. The Duffy interrogatories were essentially the same as the earlier ones which Duffy had not answered.

On November 20, 1985, the parties met and tentatively agreed to a set of facts. As part of the agreement, Duffy responded to the interrogatories. Eventually, the parties adopted a written stipulation of facts and agreed to arguing cross-motions for summary judgment.

On March 14, 1986, the court granted summary judgment for the Taxpayers on their declaratory relief claim, finding most of the activity was an illegal expenditure of public funds and personnel on political campaigning. The court noted some of Duffy's statements in his departmental memorandum and cover letter accompanying the mailing of the postcards was permissible.[4] The court denied injunctive relief as being unnecessary since the activity had stopped and there was no indication the sheriff would not abide by the ruling.

For the next several months, counsel disputed the terms of the written judgment. The court signed the Taxpayers' version on November 3, 1986. Duffy did not appeal the judgment.

---

[3] Duffy started the memorandum by stating: "Mr. Louis S. Katz, who is co-counsel for the A.C.L.U. in the suit brought against me and up to 2,000 'agents and employees of the Sheriff,' has reviewed my memo to you of February 26, 1985. He objects to some of the language in that memo and has requested the following wording, which is herewith transmitted to you: . . ." The rest of the memorandum is contained in quotes.

[4] See footnote 5, *post*.

Following entry of the judgment, the Taxpayers moved for costs and an award of attorney's fees pursuant to Code of Civil Procedure section 1021.5. The court awarded costs and fees, reducing the requested costs from $879.09 to $777.09 and the requested attorneys' fees from $39,857 to $13,350. Both sides appealed the court's order.

DISCUSSION

I

AWARD OF ATTORNEYS' FEES

■ Under Code of Civil Procedure section 1021.5, a court may award attorneys' fees to the prevailing party in an action which results in the enforcement of an important right affecting the public interest if the action confers "a significant benefit . . . on the general public or a large class of persons" and "the necessity and financial burden of private enforcement are such as to make the award appropriate."

Section 1021.5 is a codification of the private attorney general doctrine. (*Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 317 [193 Cal.Rptr. 900, 667 P.2d 704]; *Kreutzer* v. *County of San Diego* (1984) 153 Cal.App.3d 62, 74, fn. 3 [200 Cal.Rptr. 322].) ■ The "fundamental objective" of section 1021.5 is " ' "to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits . . . ." ' " (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) The statute is based on the recognition that "privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions." (*Ibid.*)

*Prevailing Party*

■ Duffy contends California Common Cause did not prevail because they failed to cause any action to be enjoined. Duffy, in support of his position, points to the trial judge's comment in his oral decision: "Although I have ruled partly in favor of the plaintiffs, it is not clear to me that I have ruled entirely in their favor."

■ A plaintiff will be considered a prevailing party when the lawsuit " 'was a catalyst motivating defendants to provide the primary relief sought' " or succeeded in " 'activating defendants to modify their behavior.' " (*Westside Community for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 353 [188 Cal.Rptr. 873, 657 P.2d 365], italics deleted.)

Determination of success "must depend on more than mere appearance . . . . [T]he trial court must 'realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right . . . .' [Citation.]" (*Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 685 [186 Cal.Rptr. 589, 652 P.2d 437].) "The critical fact is the impact of the action, not the manner of its resolution." (*Ibid.*) A plaintiff should not be denied attorney's fees because resolution in the plaintiff's favor was reached by settlement, through the defendant's voluntary cessation of the unlawful practice or because the lawsuit was resolved on a preliminary issue obviating the adjudication of other issues. (*Ibid.*; *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 938.)

Here, the Taxpayers sought to establish the illegality of the distribution of anti-Bird postcards by on-duty uniformed deputies and using departmental supplies. They obtained a declaratory judgment supporting their position. The fact injunctive relief was denied did not diminish the Taxpayers' success. By the time of the judgment, the sheriff was no longer distributing the postcards; he had voluntary ceased the unlawful practice. An injunction was not then necessary; the declaratory judgment provided full relief.

While Duffy points to the court's comment it had not ruled "entirely" in the plaintiffs' favor, he has failed to note the court's additional comment it had "conclude[d] that *most* of the conduct complained of in this action is forbidden by law . . . ." (Italics added.) The court noted three sentences[5] in the sheriff's cover letter sent out with the postcards were permissible since the sheriff had a right to nonpolitically inform and enlighten the public about matters that were "reasonably within the scope of his law enforcement duties."[6] The fact the court judicially approved three sentences out of a full page single-spaced letter hardly supports Duffy's position the plaintiffs did not prevail when the trial court ruled the rest of his actions were prohibited political activity.

---

[5] These sentences stated: "As a career law enforcement officer, I have watched the system change over the past 32 years to its present, disgraceful state. . . . [¶] Much of what is wrong with our judicial system is the direct result of the influence and efforts of Chief Justice Rose Bird. Of the criminal cases she has reviewed during her tenure, she has voted against the death penalty 100 percent of the time and in non-death penalty criminal cases, she has voted against the people of the State of California and for the Defendant 90 percent of the time."

[6] The court stated: "[T]he Sheriff has the right under our law, and indeed, the duty to inform the public about matters that are reasonably within the scope of his law enforcement duties. That means that he may in a nonpolitical way express, publish, and disseminate his opinions about such matters, as well as the underlying cold facts and statistics.

"In my opinion, that principle gives the Sheriff the right to analyze, criticize, and even irritate judges, if it may reasonably be said to serve the purpose of enlightening the public, within the scope of his official duties."

Here the plaintiffs were completely vindicated in their challenge to the postcard distribution scheme. They never sought to stifle all comments by the sheriff on Chief Justice Rose Bird's retention. The court's finding that some of Duffy's comments in the one letter were proper was not inconsistent with plaintiffs prevailing on the merits.

Duffy contends that "[t]he oral judgment . . . stated that only certain wordage and actions by [the sheriff] were 'illegal political activity'" and that "[t]he court's opinion stated nothing that could be applied to any possible repeated activities."

While the particular activity and wordage may not be repeated since Chief Justice Bird was defeated in the retention election, that does not mean the impact of the lawsuit was limited to the particular Crime Victim for Court Reform postcards and wordage. The general principles involved are applicable to future situations, including future retention elections.

*Causation*

Duffy contends nothing changed as a result of the lawsuit; he had stopped distribution of the postcards voluntarily and not as a result of the lawsuit.

"[T]o justify a fee award, there must be a causal connection between the lawsuit and the relief obtained." (*Westside Community for Independent Living, Inc.* v. *Obledo, supra,* 33 Cal.3d at p. 353; *Boccato* v. *City of Hermosa Beach* (1984) 158 Cal.App.3d 804, 811 [204 Cal.Rptr. 727].) A causal connection between the lawsuit and the result will be found if the defendant's "voluntary" action was "induced by" the plaintiff's legal action (*Northington* v. *Davis* (1979) 23 Cal.3d 955, 960, fn. 2 [154 Cal.Rptr. 524, 593 P.2d 221]) or when the plaintiff's action was a "'material' factor" or "'contributed in a significant way' to the result achieved." (*Westside Community for Independent Living, Inc.* v. *Obledo, supra,* 33 Cal.3d at p. 353.) The trial court's determination of causation is entitled to deference by the appellate court if there is any reasonable basis in the record to support the determination. (*Wallace* v. *Consumers Cooperative of Berkeley, Inc.* (1985) 170 Cal.App.3d 836, 845 [216 Cal.Rptr. 649].)

Here, the court specifically found the controversy was not moot, stating: "Even though the conduct may have been intermitted, there is no assurance that it has been terminated. And there is, as I see it, an actual controversy to be adjudicated." There was evidence the Taxpayers' lawsuit and application for a temporary restraining order induced the sheriff to stop distributing the anti-Bird postcards since, as a result of the negotiated

stipulation, the sheriff issued a memo on February 26 stating the postcards would no longer be distributed through the department.

Duffy argues the lawsuit was unnecessary because all the postcards had been distributed before the lawsuit was filed. The record indicates distribution of the postcards began after February 11. On February 15, the ACLU requested Duffy to stop distribution of the postcards. He refused. Only after he refused, was the lawsuit filed on February 19. Duffy, in the stipulated facts, stated the postcards were distributed between February 11 and February 25. Nothing in the record suggests that even if the supply of postcards on hand at the Sheriff's Department had been exhausted when the lawsuit was filed or Duffy was served, he could not have obtained more postcards. Once before, when the supply of postcards had been depleted, Duffy had sent a deputy to the Crime Victims for Court Reform committee in Los Angeles to obtain more postcards. Thus, at a minimum, the lawsuit contributed to Duffy's decision not to order any more postcards.

Moreover, even after the lawsuit was filed, Duffy continued to insist his actions were perfectly legal and the postcard distribution was not prohibited political activity. The Taxpayers' lawsuit resulted in a declaration the activity was prohibited political activity and thus corrected Duffy's misinterpretation of the law.

Duffy asserts this lawsuit involved "a mere possibility or remote or speculative future injury or invasion of rights" and therefore caused no right to be vindicated. (Cf. *Reichenberger* v. *Pritchard* (7th Cir. 1981) 660 F.2d 280, 285 [case dismissed due to failure to allege any actual deprivation of rights]; *Greenside* v. *Ariyoshi* (D.Hawaii 1981) 526 F.Supp. 1194 [in response to citizen objections, public entity agreed not to implement practice until after Attorney General had ruled on constitutionality, plaintiffs filed suit anyway, thus court held the lawsuit was "completely superfluous"].) Contrary to Duffy's assertion, the lawsuit was a material factor in halting the on-going distribution of anti-Bird postcards through the Sheriff's Department. It further established Duffy's view of the propriety of the distribution was erroneous. The same results would not have been achieved had there not been a lawsuit. If the lawsuit had not been filed or the judgment issued, most likely distribution would have continued and Duffy would continue to erroneously believe that type of activity is nonpolitical.

### Important Right

Duffy contends the litigation failed to establish an important right. The trial court found "there was a significant, an important legal issue as to

the extent to which the defendant might be allowed to engage in political or propagandistic activities relating to a current political election."

■ Section 1021.5 requires the litigation to result "in the enforcement of an important right affecting the public interest." The important right need not be constitutional in origin. (*Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 573 [216 Cal.Rptr. 367, 702 P.2d 525].) Section 1021.5 applies also to statutory rights as well as important public policies. (*In re Head* (1986) 42 Cal.3d 223, 228 [228 Cal.Rptr. 184, 721 P.2d 65]; *Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 112 [212 Cal.Rptr. 485].) ■ The "important right" requirement directs "'the judiciary to exercise judgment in attempting to ascertain the "strength" or "societal importance" of the right involved.'" (*Saleeby* v. *State Bar, supra,* 39 Cal.3d at p. 574; *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 935.) ■ "[T]he public right must be important and cannot involve 'trivial or peripheral public policies.'" (*Olney* v. *Municipal Court* (1982) 133 Cal.App.3d 455, 463 [184 Cal.Rptr. 78]; *Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 836 [160 Cal.Rptr. 465].) The right may involve established rights or "new concepts." (*County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848, 866 [223 Cal.Rptr. 846].) ■ Litigation which results in only "very limited success" or involves complaints of "no real substance or validity" does not enforce an important right affecting the public interest. (See *Boccato* v. *City of Hermosa Beach, supra,* 158 Cal.App.3d at p. 812.) The significance of the benefit "must be determined from a realistic assessment of all the pertinent circumstances." (*Olney* v. *Municipal Court, supra,* 133 Cal.App.3d at p. 463.)

■ Here, the majority of the Sheriff's arguments focus on why the plaintiffs should not have prevailed on the merits.

Initially, we note Duffy did not appeal from the declaratory judgment and therefore has conceded the correctness of the court's ruling and waived review by this court. Nonetheless, since attorneys' fees under the private attorney general theory are appropriate only when the plaintiff has vindicated an important right on behalf of the public and an erroneous holding does not benefit the public nor establish an important right, we review the merits to the extent necessary to establish the plaintiffs here vindicated an important right.

The Legislature has declared "that political activities of public employees are of significant statewide concern" and has provided "No officer or employee of a local agency shall participate in political activities of any kind while in uniform." (Gov. Code, §§ 3201, 3206.) In regard to public safety officers in particular, the Legislature has provided: "*Except* as otherwise

provided by law, *or whenever on duty or in uniform,* no public safety officer shall be prohibited from engaging, or be coerced or required to engage, in political activity." (Gov. Code, § 3302, subd. (a), italics added.) The Sheriff's own Manual of Policy and Procedures reflects these legislative prohibitions: "B. Officers are prohibited from:

"1. Using their official capacity to influence, interfere with or affect the results of an election;

"· · · · · · · · · · · · · · · · · · ·

"4. Engage in any political activity while in the uniform prescribed for any officer or employee of the County of San Diego or during any hours in which he has been directed to perform his assigned duties." (Sheriff's Department Manual of Policy and Procedures, § 2.1.42.)

Further, "in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign." (*Stanson* v. *Mott* (1976) 17 Cal.3d 206, 209-210 [130 Cal.Rptr. 697, 551 P.2d 1].) Our Supreme Court has explained: "Underlying [the] uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. . . .

"· · · · · · · · · · · · · · · · · · ·

"The importance of governmental impartiality in electoral matters finds explicit expression in a number of recent decisions. . . . '[A] fundamental goal of a democratic society is to attain the free and pure expression of the voters' choice of candidates,'. . . [and] 'our state and federal Constitutions mandate that the government must, if possible, avoid any feature that might adulterate or, indeed, frustrate, that free and pure choice . . . .' [Citations.]

". . . [T]he First Amendment precludes the government from making public facilities available to only favored political viewpoints; once a public forum is opened, equal access must be provided to all competing factions. [Citations.]" (*Id.* at pp. 217, 219.)

Here, Duffy involved on-duty uniformed personnel and departmental equipment in the distribution of postcards printed by a campaign committee

opposed to Bird's position on the Supreme Court and her retention as Chief Justice.

Duffy argues the activity here was nonpolitical and nonpartisan because Chief Justice Bird was not yet a candidate,[7] the Chief Justice position is not one "which is filled at an election,"[8] her position was not one "for which [a] party may nominate a candidate" (Elec. Code, §§ 36, 37)[9] and suggests he was just providing an informational service for the public's benefit. These arguments are based on statutory definitions not relevant either to the context of this case or the policies underlying the prohibition against using public office and funds for political campaigning. ■ In the context of the public policies here, the postcard distribution scheme was clearly partisan political activity, not informational activity.

■ The Supreme Court in *Stanson* v. *Mott, supra,* contrasted "campaign" and "informational" activities. The court noted the distinction is clear as to some activities, "thus, the use of public funds to purchase such items as bumper stickers, posters, advertising 'floats,' or television and radio 'spots' unquestionably constitutes improper campaign activity [citations], *as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents.* . . . [Citations.]" (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 221.) On the other hand, the Supreme Court observed: "a public agency pursues a proper 'informational' role when it simply gives a 'fair presentation of the facts' in response to a citizen's request for information [citations]." (*Ibid.*) " '[A] fair presentation of the facts will necessarily include all consequences, good and bad . . . .' " (*Id.* at p. 220.)

■ Here, the postcards were printed by a private campaign committee, Crime Victims for Court Reform, expressly organized to force Rose

---

[7] The Sheriff cites article VI, section 16 of the California Constitution, providing in part: "(d) Within 30 days before August 16 preceding the expiration of the judge's term, a judge of the Supreme Court . . . may file a declaration of candidacy to succeed to the office presently held by the judge. If the declaration is not filed, the Governor before September 16 shall nominate a candidate. At the next general election, only the candidate so declared or nominated may appear on the ballot . . . . [¶] . . . A nomination or appointment by the Governor is effective when confirmed by the Commission on Judicial Appointments."

The Sheriff additionally cites Elections Code section 52, in part providing: "No person shall be considered a legally qualified candidate for any office . . . under the laws of this state unless that person has filed a declaration of candidacy . . . with the proper official for the particular election . . . ."

[8] This is a reference to Elections Code section 12512 which defines "candidate for public office" as "an individual who has qualified to have his or her name listed on the ballot of any election . . . to, any state, regional, county, municipal, or district office which is filled at an election."

[9] Elections Code section 36 provides: " 'Partisan office' means an office for which a party may nominate a candidate." Section 37 provides: " 'Nonpartisan office' means an office for which no party may nominate a candidate. Judicial, school county, and municipal offices are nonpartisan offices."

Bird to resign and failing that to defeat her in the retention election. The postcards did not merely present the facts both good and bad as to the Chief Justice's tenure or her judicial opinions but rather argued only one side. Distribution of these postcards was not "informational" activity; it was political.

The fact the retention election was more than two years away did not make the postcards any less political. The campaign involving the retention of Chief Justice Bird was already underway as evidenced by the organization of campaign committees, e.g., Crime Victims for Court Reform and the Committee to Conserve the Courts, both of which were listed in Duffy's February 27, 1985, memorandum.

Nor was distribution of the postcards permitted "nonpartisan" informational activity because the judicial election did not involve "partisan" political parties. In the context of use of public office and funds to advance a position, "partisan" means favoring one side or the other, not the presence of political parties. This was made clear in *Stanson* v. *Mott, supra*. The prohibited political activity and expenditure of public funds involved in *Stanson* was a bond election, not an election for office involving a contest between political parties. The Supreme Court made clear the prohibited political conduct occurs any time a public agency "takes sides" in an election issue not just when the public agency takes sides in favor of one party's candidate rather than another. (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 217; see also *Miller* v. *Miller* (1978) 87 Cal.App.3d 762 [151 Cal.Rptr. 197] [expenditure of public funds to promote ratification of the Equal Rights Amendment].)[10] As the Taxpayers point out, if the rule were limited only to elections involving political parties, then very few elections would be covered. This surely is not the intent behind the legislation which is broadly aimed at preventing the use of public funds or office to support a political position and at preserving the integrity of the electoral process.

In addition to arguing the plaintiffs should not have prevailed on the merits, the sheriff also argues compared to other cases (i.e., *Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d 311 [right to free expression and to petition]; *Folsom* v. *Butte County Assn. of Governments, supra,* 32 Cal.3d 668 [county allocations of street and road projects]; *Baggett* v. *Gates* (1982) 32 Cal.3d 128 [185 Cal.Rptr. 232, 649 P.2d 874] [Public Safety Officers Procedural Bill of Rights (Gov. Code, § 3300 et seq.)]), this case did not vindicate an important right. We do not think what the Supreme Court has characterized as "[a] fundamental precept of this nation's democratic electoral pro-

---

[10] Duffy also argues "[i]n any event, it was never established when the Sheriff himself is off duty, if ever." What this argument has to do with anything is unclear since the undisputed evidence established his deputies while on duty and in uniform distributed the postcards.

cess" (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 217) falls into the category of an unimportant right. The lawsuit here vindicated an important right affecting the public interest.

### Significant Benefit

■ Duffy argues the plaintiffs failed to establish the litigation conferred a significant benefit on the public.

■ Section 1021.5 requires the right must be of "a significant benefit, whether pecuniary or nonpecuniary, . . . conferred on the general public or a large class of persons."

The "significant benefit" and "important right" requirements of section 1021.5 are separate elements. (See *Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 318; *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428, 435-436 [159 Cal.Rptr. 473].) The Supreme Court has explained the legislative intent behind the "significant benefit" requirement: "Of course, the public always has a significant interest in seeing that legal strictures are properly enforced and thus, in a real sense, the public always derives a 'benefit' when illegal private or public conduct is rectified. Both the statutory language ('*significant* benefit') and prior case law, however, indicate that the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation. We believe rather that the Legislature contemplated that in adjudicating a motion for attorney fees under section 1021.5, a trial court would determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case. [Citation.]" (*Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at pp. 939-940.)

■ Duffy argues the lawsuit did not benefit the public because the benefit was "mainly personal to the members of California Common Cause and the ACLU" and because "[t]he 'public' in the November 1986 election chose not to reconfirm Rose Bird."

These arguments border on frivolous. ■ First, section 1021.5 does not require the benefit inure to a majority of California residents. ■ Second, Duffy is wrong in implying the lawsuit here benefitted only Bird's supporters, California Common Cause or the ACLU. All the public benefitted from not having the government (here a law enforcement agency) take sides in the election. This benefit occurred regardless of whether Duffy was using public funds and office to support a majority or a minority

position. The benefit conferred on the public here would have been no less had the postcards involved been pro-Bird rather than anti-Bird.

■ Finally, we note the purpose behind the award of attorneys' fees under section 1021.5 is to encourage private individuals to bring litigation to enforce rights. Duffy's arguments would limit awards of attorneys' fees only to those who brought lawsuits favored by the majority. Nothing in section 1021.5 suggests it should be so limited. Nor is there any public policy which would support such a limitation particularly since the need for private enforcement of statutory and public policies is often greatest when a minority position is at issue.

### Necessity and Financial Burden of Private Enforcement

■ Duffy contends the plaintiffs failed to establish the need for private enforcement. He argues the lawsuit was prosecuted primarily for the benefit of one or two special interest groups and that the Attorney General and District Attorney refused to act "because there was nothing that was occurring; a lawsuit by anyone was unnecessary."

■ Section 1021.5 mandates that "the necessity and financial burden of private enforcement [be] such as to make the award appropriate." The fact a public agency could have brought the lawsuit does not mean private enforcement was unnecessary. "As a practical matter, public agencies cannot be expected to take every meritorious case." (*Best* v. *California Apprenticeship Council* (1987) 193 Cal.App.3d 1448, 1468 [240 Cal.Rptr. 1].) The Supreme Court has observed: "In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative." (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 44 [141 Cal.Rptr. 315, 569 P.2d 1303].)

■ This requirement of section 1021.5 looks at whether the plaintiffs' expenses in bringing the suit is disproportionate to his or her personal stake in the outcome of the litigation. (*Beach Colony II* v. *California Coastal Com., supra,* 166 Cal.App.3d at p. 113.) If the enforcement of the public interest is merely "coincidental to the attainment of . . . personal goals"

(*Olney* v. *Municipal Court, supra,* 133 Cal.App.3d at p. 464) or is "self-serving" (*Beach Colony II* v. *California Coastal Com., supra,* 166 Cal.App.3d at p. 115), then this requirement is not met. (See e.g., *Save Oxnard Shores* v. *California Coastal Com.* (1986) 179 Cal.App.3d 140, 154 [224 Cal.Rptr. 425] [attorney fees incurred in challenging Coastal Commission decision not disproportionate to private benefits gained]; *Beach Colony II* v. *California Coastal Com., supra,* 166 Cal.App.3d at pp. 113-115 [same]; *Schwartz* v. *City of Rosemead* (1984) 155 Cal.App.3d 547, 560 [202 Cal.Rptr. 400] [attorney's fees in enjoining construction of co-generation electrical plant next to home was not out of proportion to individual stake since claimed loss of value to home if plant was built was $100,000 and attorney's fees incurred were $22,000]; *California Teachers Assn.* v. *Cory* (1984) 155 Cal.App.3d 494, 515 [202 Cal.Rptr. 611] [attorney's fees not disproportionate to private interest in transfer of funds to teachers' retirement fund]; *Marini* v. *Municipal Court, supra,* 99 Cal.App.3d at p. 838 [benefit to public purely coincidental in lawsuit challenging determination state law pre-empted local diversion program].)

The fact a plaintiff has little or no personal financial interest in the outcome of the litigation and is not vindicating a private economic interest tends to show this requirement has been met. (See *Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 321; *Citizens Against Rent Control* v. *City of Berkeley* (1986) 181 Cal.App.3d 213, 229 [226 Cal.Rptr. 265]; *County of San Luis Obispo* v. *Abalone Alliance, supra,* 178 Cal.App.3d at p. 868; *Olney* v. *Municipal Court, supra,* 133 Cal.App.3d at p. 464.) It "is irrelevant" that the plaintiff's personal interest in the subject matter of the litigation was sufficient to induce him or her to bring an action; this requirement "focuses not on plaintiffs' abstract personal stake, but on the financial incentives and burdens related to bringing suit." (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 321, fn. 11.) As the Supreme Court has noted: "Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action." (*Ibid.*)

 Here, the plaintiffs requested both the Attorney General and the District Attorney to investigate the distribution of the Crime Victims for Court Reform postcards by Sheriff Duffy. Both refused. The Attorney General referred the matter to the San Diego County District Attorney. The District Attorney refused to undertake an investigation because the issue involved a civil rather than criminal matter. Thus, contrary to Duffy's assertion, the Attorney General and District Attorney did not decline to pursue the matter because "a lawsuit by anyone was unnecessary."

The plaintiffs here had no personal stake in the outcome of the litigation. The postcards were not directed at them personally but at Rose Bird. The

lawsuit did not vindicate any private economic interests; no monetary damages were sought and none were received. The trial court did not abuse its discretion in concluding private enforcement was necessary and the financial burden of the litigation made an award of attorneys' fees appropriate.[11]

## II

## COSTS

■■■ Duffy contends the trial court improperly awarded costs to the Taxpayers. His argument is premised on the Taxpayers' failure to prevail on the merits, an argument we rejected in the above discussion. Duffy also argues an award of costs was not statutorily authorized. To support his position, he cites Code of Civil Procedure, section 1032, subdivision (a) as follows: "In the superior court, except as otherwise expressly provided, costs are allowed of course: [¶] (a) To a plaintiff upon a judgment in his favor; in an action for the recovery of real property; in an action to recover the possession of personal property; in an action for the recovery of money or damages; in a special proceeding; in an action which involves the title or possession of real estate or the legality of a tax, impost, assessment, toll, or municipal fine."

This language was repealed in 1986. Section 1032, subdivision (b) now provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."[12] Thus, the award of costs was statutorily authorized and proper.

## III

## CALCULATION OF ATTORNEYS' FEES

■■■ ■■■ The plaintiffs contend the trial court abused its discretion when it reduced the number of compensated hours by over 50 percent and one of the attorney's hourly rate by 44 percent.

■■■ The amount of an attorneys' fee award under section 1021.5 must be determined by the guidelines delineated by the Supreme Court in *Serrano*

---

[11] The parties also briefed whether attorneys' fees were appropriate under 42 United States Code section 1988. Since we have decided attorneys' fees were properly awarded under section 1021.5, we need not address whether fees might also have been appropriate under some other statute.

[12] Even before section 1032 was repealed and replaced, it provided in subdivision (c): "In other actions than those mentioned in this section costs may be allowed or not, and, if allowed, may be apportioned between the parties, on the same or adverse sides, in the discretion of the court."

v. *Priest, supra,* 20 Cal.3d 25 (*Serrano III*). (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 321.) *Serrano III* requires the trial court to first determine a "touchstone" or "lodestar" figure based on a "careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case." (*Serrano* v. *Priest, supra,* 20 Cal.3d at p. 48; *Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 625 [186 Cal.Rptr. 754, 652 P.2d 985].) This figure may be increased or decreased by a "multiplier" if other factors are present.[13] ▉ The Supreme Court has explained: "The proper determination and use of the lodestar figure is extremely important. . . . '"The starting point·of every fee award . . . must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts."' [Citations.]

". . . . . . . . . . . . . . . . . . .

". . . [W]hile a trial court has discretion to determine the proper amount of an award, the resulting fee must still bear some reasonable relationship to the lodestar figure and to the purpose of the private attorney general doctrine. If there is no reasonable connection between the lodestar figure and the fee ultimately awarded, the fee does not conform to the objectives established in *Serrano III,* and may not be upheld." (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at pp. 322, 324.)

### Number of Hours

▉ Here, plaintiffs requested a total of $39,857 in attorneys' fees based on 109 minutes of computer research and 309.7 hours of work by three attorneys (Gregory Marshall, Louis Katz and Lewis Wenzell). The claim was supported by detailed declarations. The court awarded all the computer time but only 145 hours of the attorneys' time. The court justified the reduction based on "some duplication" of effort due to there being three attorneys working on the case, elimination of time "spent in accommodat-

---

[13] *Serrano III* listed a number of factors which the trial court could consider in determining whether the lodestar figure should be adjusted, including: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; [and] (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed; . . ." (*Serrano* v. *Priest, supra,* 20 Cal.3d at p. 49, fn. omitted.)

ing calls from the press and from other interested attorneys" and "some of the hours were devoted in unnecessarily adversarial skirmishing between the attorneys."

These reasons cited by the court were proper reasons for reducing a statutory fee award. (See *Serrano v. Unruh, supra,* 32 Cal.3d 621, 635 [only fees which are "reasonably spent" are recoverable]; *Northcross v. Board of Ed. of Memphis City Schools* (6th Cir. 1979) 611 F.2d 624, 636, cert. den. 447 U.S. 911 [64 L.Ed.2d 862, 100 S.Ct. 2999] [number of attorney hours may be reduced for "duplication, padding, or frivolous claims"]; *Martino v. Carey* (D.Ore. 1983) 568 F.Supp. 848 [fees reduced which were due to party's failure to cooperate and pursuing unnecessary discovery] but see *Berberena v. Coler* (7th Cir. 1985) 753 F.2d 629, 632 [court, without discussion, approved an award which included time spent responding to the press].)

The plaintiffs complain the trial court failed to make any specific findings as to how it reached its calculation and assert, based on federal law,[14] that the trial court had a duty to articulate its reasoning for eliminating requested hours. While such may be the federal law, California has not adopted such a rule.

In California, the trial court has no sua sponte duty to make specific factual findings explaining its calculation of the fee award and the appellate courts will infer all findings exist to support the trial court's determination. (See *Citizens Against Rent Control v. City of Berkeley, supra,* 181

---

[14] The federal courts in awarding statutory fees resting on the similar public policy considerations as section 1021.5 have required the trial court to identify those hours for which it does not award fees and articulate its reasons for their elimination. (See *Grendel's Den, Inc. v. Larkin* (1st Cir. 1984) 749 F.2d 945, 950 ["the district court must provide a 'clear explanation of its reasons for the fee award' "]; *Morrow v. Finch* (5th Cir. 1981) 642 F.2d 823, 824 [the court's mere recital of mandated factors "accompanied by an announcement of factual conclusions that the time spent was more than reasonably required" was insufficient]; *Greer v. Holt* (6th Cir. 1983) 718 F.2d 206, 208; *Northcross v. Board of Ed. of Memphis City Schools, supra,* 611 F.2d at pp. 636-637; *Harmon v. San Diego County* (9th Cir. 1982) 664 F.2d 770, 772.)

This specification of reasons has been deemed necessary to provide meaningful appellate review. (See, e.g., *Grendel's Den, Inc. v. Larkin, supra,* 749 F.2d at p. 950.) As the court explained in *Northcross v. Board of Ed. of Memphis City Schools, supra,* 611 F.2d at p. 636: "The hours claimed need not be automatically accepted by the [trial] court, but to the extent that hours are rejected, the court must indicate some reason for its action, so that we may determine whether the court properly exercised its discretion or made an error of law in its conclusion." Merely reciting factors which justify reducing a fee award does not necessarily provide a sufficient record to permit meaningful review, particularly when the gap between the claimed fees and the amount awarded is great. (See, e.g., *Harmon v. San Diego County, supra,* 664 F.2d at p. 772 [court refused to affirm attorney's fee award because it had "no inkling of how the district court went about applying" the applicable factors].)

Cal.App.3d at p. 233; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 754-755 [202 Cal.Rptr. 423]; see also *Beach Colony II* v. *California Coastal Com., supra,* 166 Cal.App.3d at p. 115, fn. 6; *State of California* v. *County of Santa Clara* (1983) 142 Cal.App.3d 608, 616 [191 Cal.Rptr. 204].) California courts have stated a disinclination to review the amount of an award when specific findings were not requested. (See, e.g., *Kern River Public Access Com.* v. *City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1227 [217 Cal.Rptr. 125] [rejecting claim about inadequacy of documentation of attorneys' fees, noting the attorneys had been available in court for cross-examination].) In *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 601 [197 Cal.Rptr. 303], the court stated: "The trial court may, or it may not, have followed the guidelines set forth in *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311. . . . The trial court's 'Decision' did not state the basis for its award. If the plaintiffs chose to treat this as the statement of decision (Code Civ. Proc., § 632), it was incumbent upon them to bring to the attention of the trial court any ambiguity. (Code Civ. Proc., § 634.)"[15]

Thus, in California, it is incumbent on the party who is dissatisfied with the court's calculation of the number of allowable hours to request specific findings. The Taxpayers here did not request specific findings and therefore may not now complain on appeal that they do not know which particular hours the court eliminated.

### Reasonable Hourly Rate

The plaintiffs contend the trial court erred in reducing attorney Marshall's hourly rate from $125 per hour to $70 per hour. Duffy argues the rate was properly reduced to avoid a windfall to the attorneys.[16]

The court when reducing Marshall's hourly rate, explained: "[S]ince Mr. Marshall is a salaried institutional lawyer, it is not appropriate to allow hourly fees for him at the rate that would be charged by a private, self-employed lawyer. He simply does not have the same considerations of overhead and risk that enter into the calculation of private attorneys' fees." The court adopted Duffy's counsel's suggestion of $70 an hour as a reason-

---

[15] The court in *Guardians of Turlock's Integrity* v. *Turlock City Council, supra,* 149 Cal.App.3d at page 601, did, however, remand for recalculation of attorney's fees because the trial court used the wrong standard to determine whether the plaintiff had prevailed.

[16] We note Duffy's argument is somewhat disingenuous in light of the fact his counsel, in resisting a motion to compel answers to interrogatories, requested attorney's fees at $125 per hour with the justification: "I understand [it] is the standard community rate for private attorneys."

able rate, observing it was consistent with the hourly rates the court had observed in billings by attorneys employed by banks and trust companies. The court expressly stated it was confident Marshall would bill at a higher rate if he were in practice as a self-employed lawyer.

Our Supreme Court has approved a "market value" approach to awarding attorney fees, approving an award to a public attorney based on the prevailing market rate rather than a "cost plus" approach. (*Serrano* v. *Unruh, supra,* 32 Cal.3d at pp. 641-642.) The Supreme Court has observed an approach which awarded lower fees to public-interest attorneys would "inspire 'lesser incentive to settle a suit without litigation than would be the case if a high-priced private firm undertook plaintiff's representation.' [Citations.]" (*Id.* at p. 642.) The Supreme Court has also rejected the argument that awarding fees at a market rate to a public interest attorney would result in a windfall: " 'We do not think . . . that compensating a public interest organization . . . on the same basis as a private practitioner results in . . . a windfall . . . . Indeed, we are concerned that compensation at a lesser rate would result in a windfall to the defendants.' [Citations.]" (*Ibid.*) Subsequent decisions by the Courts of Appeal have also approved awards to public interest attorneys based on a prevailing market rate, noting "the market value approach is more likely to entice competent counsel to undertake representation of difficult and otherwise unrewarding cases." (*Margolin* v. *Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1004 [185 Cal.Rptr. 145]; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino, supra,* 155 Cal.App.3d at p. 755.)

In line with these cases, we conclude the court erred in reducing Marshall's hourly rate to $70 per hour based on his status as a salaried institutional lawyer and should have awarded his fees based on an hourly rate of $125. Accordingly, the fee award should be increased by $5,225 (the difference between $125 and $70 per hour ($55) multiplied by the number of hours allowed (95)) to a total award of $18,804.

## IV

### SANCTIONS

The Taxpayers request sanctions from Duffy for taking a frivolous appeal.

Sanctions for a frivolous appeal are appropriate only when an appeal is prosecuted for an improper purpose (to harass the respondent or delay the effect of an adverse judgment) or when "it indisputably has no merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646

P.2d 179].) While some of Duffy's arguments may border on frivolous, we cannot say the appeal as a whole was frivolous nor that it was taken for an improper purpose. Therefore, sanctions are denied.

Further, we note the Taxpayers are entitled to attorneys' fees for vindicating their claims on appeal. (*Guardians of Turlock's Integrity* v. *Turlock City Council, supra,* 149 Cal.App.3d at p. 601.)

## DISPOSITION

The award of attorneys' fees is modified to reflect a total award of $18,804 but otherwise affirmed. The request for sanctions is denied.

Butler, J., and Benke, J., concurred.