[No. B046173. Second Dist., Div. Seven. July 18, 1991.]

KATHLEEN ANGELHEART et al., Plaintiffs and Appellants, v.
CITY OF BURBANK et al., Defendants and Appellants.

## COUNSEL

Pegine E. Grayson, Litt & Stormer, Theresa M. Traber, Anne K. Richardson and Barrett S. Litt for Plaintiffs and Appellants.

Joseph W. Fletcher, City Attorney, and Juli C. Scott, Chief Assistant City Attorney, for Defendants and Appellants.

## OPINION

**LILLIE, P. J.**—Defendants City of Burbank, Michael R. Hastings, in his capacity as Mayor of Burbank, and Robert Bowne, Al Dossin, Mary Lou Howard, and Mary Kelsey, in their capacity as members of the Burbank City Council (herein referred to as City), appeal from an order awarding plaintiffs attorneys' fees of $18,700 pursuant to Code of Civil Procedure section 1021.5. Plaintiffs Kathleen Angelheart, Norman Angelheart, Laurie Salas, Candy Stallings, and Mark Stallings (hereinafter collectively referred to as plaintiffs) cross-appeal from that portion of the order denying them the full amount of attorneys' fees sought, in the amount of $71,286.62.

### FACTUAL AND PROCEDURAL BACKGROUND

The award of attorneys' fees arises out of plaintiffs' successful challenge to City's former regulation of large family day-care homes, which regulation, they claimed, was in violation of state law.

In 1987, Mrs. Angelheart provided child care in her Burbank home for 12 children, including children of plaintiffs Stallings. Plaintiff Salas, a Burbank resident, also was licensed by the state to operate a small family day-care center, and applied to operate a large family day-care center. In September 1987, City informed the Angelhearts they were required to apply for a conditional use permit from City and that the city ordinance limits the number of children to be cared for in any day-care home to 10. After hearing, City planning board (Planning Board) granted the Angelhearts a conditional use permit, with several conditions, including the condition

limiting to nine the number of children under age five. To remove the conditions imposed on their permit, the Angelhearts appealed the Planning Board's decision to the Burbank City Council which denied the permit for a large day-care facility, thus limiting to six the number of children the Angelhearts were allowed to care for in their home.

In April 1988, plaintiffs filed petition for writ of mandate (Code Civ. Proc., §§ 1085, 1094.5) and complaint for declaratory and injunctive relief against City. Plaintiffs contended, inter alia, that the state Legislature, by the California Child Day Care Facilities Act (Health & Saf. Code, § 1596.70 et seq.; the Act), has occupied the field of family day-care regulation preempting all municipal regulation not expressly permitted by the Act, and that the application of certain City ordinances to plaintiffs was in violation of the Act. Plaintiffs also alleged that pursuant to state law, Burbank could not prohibit large family day-care homes in an area zoned for single-family dwellings (Health & Saf. Code, § 1597.46, subd. (a)), a large family day-care home being defined as a home providing care for seven to twelve children. (*Id.*, at § 1596.78, subd. (a).) These issues were contested by City.

In September 1988 plaintiffs obtained a peremptory writ of mandate commanding City, on or before November 16, 1988, to establish a procedure for regulating large family day-care homes that complies with the Act. The return date of November 16 was subsequently continued to December 22, 1988 and, in early December, City did enact an ordinance pursuant to the writ.

On December 21, 1988, plaintiffs filed objections to four provisions of the new ordinance, claiming the provisions violated state law. The return date was continued to March 6, 1989; after hearing on the return, the court made a minute order dated March 9, 1989, stating in pertinent part that "the ordinance is not invalid on its face." The court, while acknowledging that certain applications of the ordinance in the future may constitute a violation of state law, interpreted the ordinance to obviate many of plaintiffs' concerns and to be consistent with state law.

City filed an appeal from the March 9 order on June 7, 1989, which appeal was subsequently dismissed on plaintiffs' motion sometime in mid-July 1989. Although our record is unclear as to the grounds for the dismissal, plaintiffs' attorney claimed on the hearing on the motion for fees that the appeal was untimely.

On July 3, 1989, plaintiffs filed a motion for attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5, seeking attorneys' fees and costs totaling $71,286.62.[1]

According to declarations filed in support of the motion, four attorneys at Litt & Stormer spent a total of about 354 hours on the case from January 1988 to April 1989, which at the various billing rates of the attorneys, resulted in fees of about $43,514. Two attorneys from Public Counsel, the public interest law office of the Los Angeles and Beverly Hills Bar Associations, spent a total of about 87 hours on the case, which, according to their billing rates, resulted in a fee of $12,694. To these fees, totaling about $56,200, plaintiffs argued that the court should apply a multiplier of 1.25, which would result in a total fee award of about $71,286. Plaintiffs based the application of a multiplier on certain factors, including the relatively low-income status of plaintiffs, the small size of Litt & Stormer, the unpopular and expensive nature of bringing suit against a municipality, and the "admirable results" in obtaining the "precise relief" sought.

In opposition to the motion, City argued the motion was untimely under California Rules of Court, rule 870 and even if timely, plaintiffs do not meet the criteria for attorneys' fees set out in Code of Civil Procedure section 1021.5. City's senior assistant city attorney declared that the issues presented in the case were not particularly complex or unusual; the total amount of hours (over 400) spent by plaintiffs' attorneys on the case was "greatly in excess" of the time necessary for experienced attorneys as are plaintiffs' attorneys, and she herself did not spend more than 200 hours on the entire case.

After hearing on the motion, the matter was submitted. ▬▬▬▬ On October 10, 1989, the court made the following order: "The Court finds that the reasonable attorneys' fees based upon the work performed amount to $18,700.00 (approximately one-third of the amount claimed)."[2]

---

[1]Code of Civil Procedure section 1021.5 provides in pertinent part: "Upon motion, a court may award attorney's fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

[2]The order, which appeared on a form similar to a clerk's minute order form, also stated: "Counsel for plaintiff has submitted an incredible accumulation of attorney hours in their application for fees. Attorneys of their asserted competence and experience could and should have been able to produce the work product reflected in the file in substantially less than the 441.75 attorney hours. Even with attendant activities before the board, etc., 150 hours would

City filed timely notice of appeal from the October 10, 1989, order, and plaintiffs filed timely notice of cross-appeal from said order. We deal first with City's appeal.

I

CITY'S APPEAL

A. *Timeliness of Motion*

■ City contends that the motion was untimely pursuant to California Rules of Court, rule 870. That rule, by its express language, is not here applicable. The rule provides in part that "A prevailing party who claims costs shall serve and file a memorandum of costs within 15 days after the date of mailing of the notice of entry of judgment or dismissal by the clerk under Code of Civil Procedure section 664.5 or the date of service of written notice of entry of judgment or dismissal, or within 180 days after entry of judgment, whichever is first." (Cal. Rules of Court, rule 870(a).)

"But section 1021.5, pursuant to which the attorney fees were awarded, clearly provides a special motion procedure plainly intended to be initiated after the result of the action is known but subject to no express time limit. The motion procedure sharply distinguishes a claim for fees under section 1021.5 from an ordinary costs claim which is made not by motion but by memorandum and which is brought to hearing (if at all) not by the claimant but by the adversary's motion to tax [citation]. In our view the more specific provisions of section 1021.5 control the more general procedure described in [former] section 1033 . . . ." (*Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 834 [160 Cal.Rptr. 465].)

As the provisions of rule 870 dealing with the time within which a memorandum of costs is to be filed have no application to the motion procedure set out in Code of Civil Procedure section 1021.5, City's contention is without merit.

be generous. That determination is supported by the same showing [of] expertise presented by counsel to justify their hourly rate. Nor is there any basis for the application of any multiplier. [¶] There is a threshold showing that [plaintiffs have] enforced an important right affecting the public interest. However, at this juncture it can be said only that it benefits anyone seeking childcare in the City of Burbank. There is no showing that any other city has failed to comply with the statutory scheme without whatever encouragement which might inure from these proceedings. Here, the 'public' is limited—comprised of the residents of Burbank."

The order is appealable. (*Citizens Against Rent Control* v. *City of Berkeley* (1986) 181 Cal.App.3d 213, 223 [226 Cal.Rptr. 265].)

B. *Significant Public Benefit*

██ City contends that the court's finding that the action conferred a significant benefit on the residents of Burbank in enforcing an important right is "not supported by any credible evidence." City points to the undisputed evidence it submitted in opposition to the motion to the effect that the Angelhearts' application to operate a large family day care center in Burbank was one of only two applications the City received in the two years prior to the lawsuit and since the adoption of its new ordinance, the Angelhearts' application was only one of three such applications.

██ "The trial court has discretion to determine whether an award of section 1021.5 attorney fees is appropriate. [Citation.] A reversal of the trial court's determination will lie only if the resultant injury is sufficiently grave to amount to a manifest miscarriage of justice, and no reasonable basis for the action is shown." (*Weissman* v. *Los Angeles County Employees Retirement Assn.* (1989) 211 Cal.App.3d 40, 46-47 [259 Cal.Rptr. 124]; internal quotation marks omitted.)

██ The private attorney general theory as embodied in section 1021.5 is "clearly designed to encourage private enforcement of important public rights." (*Marini* v. *Municipal Court, supra,* 99 Cal.App.3d 829, 835-836.) "The important right need not be constitutional in origin. [Citation.] Section 1021.5 applies also to statutory rights as well as important public policies. [Citations.] The 'important right' requirement directs the judiciary to exercise judgment in attempting to ascertain the strength or societal importance of the right involved. [Citations.] [T]he public right must be important and cannot involve trivial or peripheral public policies. [Citations.] . . . . The significance of the benefit must be determined from a realistic assessment of all the pertinent circumstances." (*California Common Cause* v. *Duffy* (1987) 200 Cal.App.3d 730, 745 [246 Cal.Rptr. 285], internal quotation marks omitted.)

A tangible asset or a concrete gain does not have to be present to satisfy the requirement that the action confer a significant benefit; rather, the effectuation of a fundamental constitutional or statutory policy may be present. (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 112 [212 Cal.Rptr. 485].)

The California Child Day Care Facilities Act contains the provision that "It is the intent of the Legislature that family day care homes for children must be situated in normal residential surroundings so as to give children the home environment which is conducive to healthy and safe development. It is the public policy of this state to provide children in a family day care home

the same home environment as provided in a traditional home setting." (Health & Saf. Code, § 1597.40, subd. (a).) The Legislature also declared "this policy to be of statewide concern with the purpose of occupying the field to the exclusion of municipal zoning, building and fire codes and regulations governing the use or occupancy of family day care homes for children, except as specifically provided for in this chapter, and to prohibit any restrictions relating to the use of single-family residences for family day care homes for children except as provided by this chapter." (*Ibid.*)

 In light of these legislative declarations of policy, the trial court reasonably could have determined that the action involved an important right affecting the public interest. City has not established any abuse of discretion as to this factor.

We now address the separate factor of whether the action conferred a significant benefit. "The Supreme Court [in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 939-940 (154 Cal.Rptr. 503, 593 P.2d 200)] has explained the legislative intent behind the 'significant benefit' requirement: 'Of course, the public always has a significant interest in seeing that legal strictures are properly enforced and thus, in a real sense, the public always derives a "benefit" when illegal private or public conduct is rectified. Both the statutory language (*"significant* benefit") and pri or case law, however, indicate that the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation. We believe rather that the Legislature contemplated that in adjudicating a motion for attorney fees under section 1021.5, a trial court would determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case.' " (*California Common Cause* v. *Duffy*, *supra*, 200 Cal.App.3d 730, 749, original italics.)

 In the instant case, there is no evidence in the record to support the trial court's conclusion that all of the residents of Burbank seeking child care benefited from the action. In fact, there is no evidence that there was any other person in Burbank, like the Angelhearts, who sought a permit for more than the 10 children allowed in a family day-care home under the former municipal ordinance. There is no evidence that the Angelhearts' action, although successful and involving an important public policy, affected a large class of persons.

The trial court's conclusion cannot be supported by the facts that two persons applied for a large family day-care home permit in the last two years

under the former regulations and that three persons applied for such permit during the first seven months after enactment of the new ordinance. There is nothing to indicate that these applicants were affected by the change in the Burbank zoning ordinances. In other words, the trial court abused its discretion in concluding that the Angelhearts' action affected others in Burbank when there was no evidence that there were other similarly situated applicants, or that other family day-care homes were then affected by the change in the ordinance, or that family day-care homes would be so affected in the future.

As the California Supreme Court explained in *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311 [193 Cal.Rptr. 900, 667 P.2d 704], wherein the court upheld an award of attorney fees in a case involving free speech and petition rights, "Of course, not all lawsuits enforcing constitutional guarantees will warrant an award of fees. For example, in *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158 . . . , this court held that plaintiffs were not entitled to attorney fees since their litigation, while based on the constitutional right to be free from the arbitrary deprivation of private property, vindicated only the rights of the property owners of the single parcel at issue. . . . [¶] . . . While that right was certainly important, the economic interests protected in that case can hardly be considered as fundamental as the equal protection rights vindicated in *Serrano* v. *Priest* (1976) 18 Cal.3d 728 . . . , or the freedom of speech and petition rights enforced in the present case. [¶] Second, the primary effect of the judgment in *Pacific Legal Foundation* was merely to invalidate a condition placed on a land use permit which encumbered the value of a single parcel of property. Only plaintiffs' personal economic interests were advanced by their lawsuit. Under those factual circumstances, the litigation 'did not result in conferring a "significant benefit" on a "large class of persons." ' " (34 Cal.3d at pp. 319-320, fn. 7.)

We believe the instant case is similar on its facts to *Pacific Legal Foundation*, which compels the conclusion that the trial court abused its discretion in concluding that the Angelhearts' litigation conferred a significant benefit on a large class of persons. Our record simply provides no reasonable basis to support the trial court's conclusion. Nor is there any evidence in our record to support the speculative assertions by the dissent that other cities are violating state law and that this case would have ramifications for other cities and family day care providers. In fact, most of the assertions in the dissent are premised entirely on speculative matters that appear nowhere in this record.[3]

---

[3]Angelhearts filed a motion to take additional evidence, or in the alternative to take judicial notice, and petition for rehearing based on supplemented record. Inasmuch as we have denied the motion and petition, the "additional evidence" is not properly before us. For this reason,

■ "Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." (*Beach Colony II* v. *California Coastal Com.*, *supra*, 166 Cal.App.3d 106, 114.) In *Beach Colony II*, where property owners engaged in litigation resulting in a published decision involving the "relationship of the coastal act and common law . . . in the area of avulsion," (166 Cal.App.3d at p. 112), the court stated: "Colony II's allegation [that the public got something for nothing from its litigation] ignores the fact that the benefits it obtained are immediately and directly translated into monetary terms. The public benefits are not likely to result in any economic benefit to more than a few persons, even in the future. While every citizen theoretically benefits by rulings which compel a governmental body to follow the law and which resolve disputes over applicable law, that benefit is not pecuniary in nature. . . . However, only Colony II reaps the substantial, present economic benefit it would have lost had the litigation been unsuccessful." (166 Cal.app.3d at p. 113.)

As the trial court abused its discretion in finding the existence of one of the necessary statutory elements under section 1021.5, there is no basis for an award of fees, and reversal is warranted. We need not address the issue of financial burden.

In light of the above conclusion, we also need not address the Angelhearts' claim on their cross-appeal that the trial court abused its discretion in determining the amount of the fees.

DISPOSITION

The order is reversed. The parties are to bear their own costs on appeal.

Woods (Fred), J., concurred.

---

we need not address arguments in the dissent which are premised on the "additional evidence."

However, it is not true, as asserted in the dissent, that Angelhearts had no reason to address the "significant benefit" issue until the majority opinion was filed. Angelhearts not only had an opportunity to present evidence on the issue to the trial court, but they had the burden of proof on that issue below.

Even were we to deem the declarations submitted by Angelhearts to be part of our record, we would reach the same result on this appeal. The declarations fail to establish that it was the trial court's *Angelheart* decision, as opposed to the clear statutory mandates, or other factors, that caused some local governments to conform their regulations to state law. The declarations also fail to establish that a large class of persons has been affected by the *Angelheart* decision. Other than in the case of the Angelhearts themselves, there is no evidence that local governments have actually enforced invalid provisions of their ordinances against large family day-care providers. There is no evidence a municipality relied upon such provisions to deny or condition a permit to any other provider.

**JOHNSON, J.**—I respectfully dissent.

I, too, would reverse the trial court's judgment but for different reasons. Those different reasons would require a remand to the trial court for the purpose of applying the correct standards in fixing the *amount* of the attorney fee award, a process which inevitably would result in a higher award in this case.

The threshold issue, however, is whether respondent was entitled to an attorney fee award of any kind. The majority says no. I reach the opposite conclusion.

I. As the Trial Court Ruled, the Child Care Home Was Entitled to an Attorney Fee Award Under Code of Civil Procedure Section 1021.5.[1]

The majority concedes the trial court "reasonably could have determined that the [child care home's] action involved an important right affecting the public interest." (Maj. opn., *ante*, p. 468.) But then it concludes the trial court erred in finding this action involving an important right affecting the public interest conferred a significant benefit, pecuniary or nonpecuniary, on the general public or a large class of persons.

I begin by reiterating the standard on review the majority opinion itself endorses: "The trial court has discretion to determine whether an award of section 1021.5 attorney fees is appropriate. [Citation.] A reversal of the trial court's determination will lie only if the resultant injury is sufficiently grave to amount to a manifest miscarriage of justice, and no reasonable basis for the action is shown." (*Weissman* v. *Los Angeles County Employees Retirement Assn.* (1989) 211 Cal.App.3d 40, 46-47 [259 Cal.Rptr. 124]; internal quotation marks omitted.)

What the majority opinion says about measuring the significance of a benefit also bears repeating: "The significance of the benefit must be determined from a realistic assessment of all the pertinent circumstances." (*California Common Cause* v. *Duffy* (1987) 200 Cal.App.3d 730, 745 [246 Cal.Rptr. 285], internal quotation marks omitted.) A tangible asset or a concrete gain does not have to be present to satisfy the requirement that the action confer a significant benefit; rather, the effectuation of a fundamental constitutional or statutory policy may be present. (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 112 [212 Cal.Rptr. 485].)

---

[1]Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

In the instant case, the trial court found that all of the residents of Burbank seeking child care benefited from the action. It is also reasonable to infer that providers of home child care in Burbank, like the Angelhearts, also benefited, because the action caused Burbank to adopt new zoning ordinances which complied with state law. Thus, the impact of the Angelhearts' action on others similarly situated is a continuing one and establishes the rights of all large family day-care home providers in Burbank. (166 Cal.App.3d 106.)

"In *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, 939-941, the Supreme Court recognized that forcing a city council to comply with the Subdivision Map Act by making proper findings could be a 'significant benefit' and presented a factual issue to the trial court." (*Kern River Public Access Com.* v. *City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1227 [217 Cal.Rptr. 125]; also finding a significant benefit was conferred by litigation forcing local governments to comply with state laws are *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 754 [202 Cal.Rptr. 423], and *State of California* v. *County of Santa Clara* (1983) 142 Cal.App.3d 608, 614-615 [191 Cal.Rptr. 204].)

The instant litigation, however, accomplished more than "forcing a city council to comply with state laws" in this specific case. Beyond that, it forced Burbank to reform its own ordinances. Thus, the plaintiffs brought about a *change in the law* which will benefit directly Burbank's other existing and potential home child care providers, the city's children, parents, employers, and other citizens for the foreseeable future. Accordingly, the Angelheart litigation presents an even more compelling case of "significant public benefit" than those several cases which have approved attorney fee awards where the litigation only reminded local authorities to obey an existing statutory provision. (See, e.g., the cases cited in the preceding paragraph.)

The facts that only two persons applied for a large family day-care home permit in the last two years under the former regulations and that three persons applied for such permit during the first seven months after enactment of the new ordinance does not support the majority's position. The trial court reasonably could have inferred from the evidence provided by Burbank that the new ordinance encouraged more people to operate large family day-care homes in Burbank than under the former regulations. Even under the figures the city supplied, an average of only one application a year was submitted under the former regulations, while an average of five or six per year could reasonably be expected to be submitted under the new ordinance. This represents a substantial increase in the availability of large family

day-care homes in Burbank and over time probably will benefit hundreds of Burbank children, their parents, and their parents' employers.

Even in the absence of specific evidence about how many Burbank citizens had applied to operate "large" family day-care homes as of the time of the hearing on attorney fees, it is feasible for courts to estimate whether there will be enough in the future so the Angelhearts' legal action conferred "significant benefits." After all, only seven months had elapsed after the ordinance changed permitting the creation of new "large" home child care facilities or the expansion of existing "small" facilities. It requires time for word to spread about the legal feasibility of this new opportunity. Moreover, for those who hear about this possibility, it takes time to make arrangements to enter a new business or expand an old one. In this, as in many other cases, it would place an intolerable burden on plaintiffs to require them to "prove" how many people will take advantage of the legal change they have brought about at a time shortly after the change has occurred. Yet the majority insists on just that kind of proof in this case, complaining of the lack of specific evidence about known beneficiaries at the time of the hearing.

For obvious reasons, this is not what the law requires. Instead, the courts are to make a *"realistic* assessment of *all* the pertinent circumstances" (*California Common Cause* v. *Duffy, supra,* 200 Cal.App.3d 730, 745, italics added). Since most of the beneficial actions produced by a legal change will occur in the future—often far in the future—courts often must base their "assessment" of "significant benefits" on the basis of predictions and estimates. (*Los Angeles Police Protective League* v. *City of Los Angeles* (1986) 188 Cal.App.3d 1 [232 Cal.Rptr. 697].) In the instant case, it was entirely reasonable for the trial court to predict there would be enough "large" home child care facilities created in Burbank in future years to estimate plaintiffs' legal action *eventually* will confer "significant benefits" on a large number of Burbank citizens—children, parents, employers, and other citizens. In a city the size of Burbank, it is far more reasonable to predict *many* people will decide to start new "large" home child care facilities or expand "small" ones than to assume the Angelhearts are the only ones or that there are *few* others who will follow their lead. If the Legislature felt there were only few who could be encouraged to operate "large" home child care facilities, it seems doubtful it would have bothered to pass the legislation freeing these facilities of local land use restrictions. I suspect the Legislature was right about California in general and the trial court was right about Burbank.

Beyond the benefits the trial court expressly found this action to have conferred on residents of Burbank, on appeal we cannot ignore the

beneficiaries in other California cities. "The [significant benefit] element of . . . section 1021.5 . . . is often decided as well—if not better—by an appellate court as opposed to a trial court. How many people will receive what kind of benefit, and how much, as a result of a given legal action is usually more of a value judgment than an issue of fact." (*Los Angeles Police Protective League* v. *City of Los Angeles, supra,* 188 Cal.App.3d 1, 9.)

Burbank's attempt to further resist complying with state law by taking an appeal ended with a dismissal. Thus, the city avoided establishing an appellate precedent which undoubtedly would have been unfavorable to its position and would have directly impacted on all cities in this state. But the fact this case was resolved short of an appellate decision does not mean the result is without practical effect elsewhere.

One would have to be blind to the practicalities of the real world to assume word of this court order would not reach many of the city governments in California, especially the scores of municipalities which share the Los Angeles basin with Burbank. It is probable none of these cities had yet had time to react to this news by changing their own land use regulations as of the date of the hearing on the request for attorney fees. So the plaintiff would have been hard pressed to demonstrate at that hearing there had been a ripple effect beyond the borders of Burbank. Nevertheless, any *"realistic assessment of all* the pertinent circumstances" (*California Common Cause* v. *Duffy, supra,* 200 Cal.App.3d 730, 745, italics added) cannot ignore the probability the Angelhearts' action will encourage *voluntary* legal change elsewhere which will confer benefits on home child care providers, parents, children, employers, and other citizens in cities throughout the Los Angeles basin, and beyond.

It cannot be disputed many local jurisdictions had land-use restrictions which prevented large home child care facilities from operating. Indeed, this is the very reason state lawmakers found it necessary to enact legislation preempting those restrictions. The Angelhearts' litigation serves as an example to these jurisdictions that they must change their land use laws to make them coincide with the new state law in this field.

If other cities do not change their land use regulations voluntarily, moreover, the plaintiffs' pioneering legal action has made it much easier for similarly situated home child care providers to *compel* change in their counties and municipalities. The pleadings, briefs, and all the rest the plaintiffs' lawyers drafted are part of the public record and available to lawyers representing other prospective home child care providers hoping to expand in other cities whose current land use restrictions are inconsistent with state law. So are the court orders compelling Burbank to amend its land

use restrictions which lawyers in subsequent lawsuits can bring to the attention of the trial courts in their cases. The time and money plaintiffs' lawyers were required to invest in bringing the first, path-breaking lawsuit on this issue will redound to the benefit of others who need to follow down that same path in order to open or expand their home health care facilities in jurisdictions beyond Burbank.

The majority characterizes what I consider a "realistic assessment" of "all the pertinent circumstances" as "speculative assertions . . . that other cities are violating state law and that this case would have ramifications for other cities and family day care providers . . . premised entirely on speculative matters that appear nowhere in this record.

As mentioned earlier in this dissent, the court's role here is different from the traditional one of reconstructing the facts of what actually happened sometime in the past. When performing the latter more typical function, judges or juries are "*fact* finders" and are prohibited from "speculating" in the sense of estimating or inferring what might have happened from anything other than hard evidence that is placed in the record. But occasionally the law asks judges to do something quite different—to forecast the future. Section 1021.5 represents one of those occasions—when it requires judges to assess the quantity and quality of "public benefits" a given legal action is likely to generate. Rarely can that assessment be made without peering into the future and *predicting* what the facts *will be* as contrasted with *finding* what they *have been*.

Of necessity, this sort of assessment brings into play a broader range of information than the already existing *facts* the parties might produce in the form of evidence. The judge, as predictor, must apply some common sense knowledge about the behavior of individuals and institutions—how they have behaved in the past and how they are likely to behave in the future.

It does not require a great deal of specialized knowledge to forecast many local jurisdictions will turn out to have restrictive land-use regulations like Burbank's (otherwise why did the Legislature bother passing the law it did). Nor, is it at all "speculative" to predict many of those local jurisdictions will, like Burbank, resist complying with the new state law. Unless we indulge in the unlikely assumption Burbank's government is *uniquely* obstinate, the vigor of that city's opposition in this lawsuit would lead one to forecast there were a number of other jurisdictions which had not *spontaneously* reformed their land use laws to comply with the new state law prior to the *Angelheart* decision. For these cities and counties, *Angelheart* could either be a beacon or a whip. Either way, the Angelhearts' lawsuit would deserve considerable credit for the benefits flowing when those jurisdictions eliminated their

restrictions against large home child care centers. Furthermore, for judges, as former members of the legal profession, it is reasonable not "speculative," to forecast lawyers will learn of and use the *Angelheart* decision, its pleadings and briefs, to the fullest in persuading or compelling these other cities and counties to comply with the state law.

Understandably, there was no hard evidence in the record of a hearing which took place only four months after the Angelheart litigation succeeded as to that litigation's future impact in persuading or compelling other local jurisdictions to change their land use regulations. There simply was not time for any of these events to have occurred. Any evidence the Angelhearts attempted to introduce at that hearing would have been "speculative" (at least as the majority of this court defines "speculative") and dismissible as such.

Ironically and sadly, however, my colleagues on this court, after dismissing my "realistic assessment" as "speculative assertions" have closed their eyes and ears to *evidence* demonstrating this case not only "would have" but *has had* profound "ramifications for other cities and family day care providers." Now that enough time has passed for what seemed a reasonable indeed nearly inevitable prediction to be proved or disproved, that prediction has been borne out. But after dismissing the prediction as speculation the majority insists on ignoring reality as well.

The Angelhearts have submitted a motion to take additional evidence under section 909[2] of certain declarations and to take judicial notice of changed ordinances. These declarations document—as was predictable—that in the years since it was issued the trial court decision in *Angelheart* has been used by lawyers throughout the state to persuade or compel local governments to amend their land use laws to allow large home child care facilities.[3]

---

[2]Code of Civil Procedure section 909 provides:

"In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the reviewing court may make factual determinations contrary to or in addition to those made by the trial court. The factual determinations may be based on the evidence adduced before the trial court either with or without the taking of evidence by the reviewing court. The reviewing court may for the purpose of making the factual determinations or for any other purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, and may give or direct the entry of any judgment or order and may make any further or other order as the case may require. This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court except where in the interests of justice a new trial is required on some or all of the issues."

[3]For instance, in describing the zoning project of the Child Care Law Project of Public Counsel which was not started in Los Angeles County until 1990, Pegine Grayson, Esq., offers a declaration that: "The goal of the Zoning Project is to review and analyze the family day care zoning ordinances of all 86 cities in Los Angeles County. . . . I have thus far reviewed and analyzed the family day care zoning ordinances of at least 25 Los Angeles

Furthermore, those same declarations document—as was predictable—that lawyers have used the pleadings, legal theories, briefs, etc. prepared in the Angelhearts' litigation as models to follow in preparing their own lawsuits to compel local governments to change their land use laws.[4] These lawyers

County cities. With one exception, I have found the Municipal Codes of the cities reviewed to date to contain provisions which, . . . violate State law and serve as substantial barriers to the establishment of these facilities, in direct contradiction of the express legislative mandate. . . . I have informed the group of volunteer attorneys assigned to work with cities . . . targeted by the Zoning Project of the court's ruling in the *Angelheart* case, and have encouraged them to share the information with city attorneys who may not be entirely convinced of the degree of State preemption in the area of family day care regulations. As a direct result of these volunteers' efforts, three of the targeted cities have enacted new family day care zoning ordinances that comply with State law. Several others have drafted amendments that are slated for public hearings in the near future, and still others are in the process of drafting such amendments. . . . I headed the effort in 1990 to bring the County's family day care zoning ordinance into compliance with State law. I discussed the *Angelheart* decision with County planning staff on numerous occasions, and succeeded in convincing them to amend their regulatory process. The new, lawful ordinance went into effect in February of this year [1991]. . . . I firmly believe that the clear, positive ruling obtained by the petitioners in *Angelheart* has already had and will continue to have a broad impact throughout the County of Los Angeles and the State of California. Child care advocates have been making extensive use of the decision, and as other cities become aware of it, they should be encouraged to bring their family day care zoning ordinances voluntarily into compliance with State law." (Declaration of Pegine E. Grayson, executed July 31, 1991, at pp. 2-5.)

Meanwhile, Carol S. Stevens, Esq., staff attorney of the Child Care Law Center in San Francisco, declares that in attempting to "change local ordinances to meet state law mandates" in northern California counties and cities her organization found that "municipal ordinances in many of these cities contained provisions analogous to those found to be unlawful by the *Angelheart* court. . . . In many communities we encountered significant resistance to compliance. . . . Although it does not establish a precedent, the trial court decision in *Angelheart* has been useful to strengthen our advocacy position. . . . Our experience has been that many city governments and planning departments achieve compliance with state law requirements only when lawyers become involved in advocacy efforts and the potential for legal action, such as that brought by plaintiffs in Angelhart [*sic* ], is imminent. Currently, approximately twenty percent of the requests for legal assistance we receive in California involve family day care zoning issues. There remain hundreds of California municipalities where the mandates of state law have yet to be reflected in municipal zoning ordinances. The ruling in *Angelhart* [*sic* ] has been and will continue to be beneficial to counsel . . . as we represent individual family day care providers and provide information and technical assistance to providers in communities where we cannot undertake individual representation." (Declaration of Carol S. Stevens, executed July 31, 1991, at pp. 2-3.)

As to Orange County, Kristine Adams-Charton, Esq., offered a declaration that the Poverty Law Center in that county "provides . . . child care advocates [appearing before planning department hearings and city council hearings] with the legal arguments and results of the Angelheart case. This information has provided advocates with persuasive authority of a past judicial determination on these family day-care issues." (Declaration of Kristine Adams-Charton in Support of Motion for Reconsideration, executed on July 31, 1991, at p. 2.)

[4]For instance, the declaration offered by Kristine Adams-Charton, Esq., director of litigation of the Poverty Law Center of Orange County, states: "The Angelheart case has been the basis of writs of mandamus filed against the Cities of Westminster and Orange. In both cases [lawyers] relied on arguments made in the Angelheart pleadings to shape their legal strategies

attest the *Angelheart* decision and the Angelhearts' lawsuit have been instrumental in efforts, many successful already, to amend local land use laws the length and breadth of the State of California, including the counties of Los Angeles, Plumas, and Amador, the cities of Santa Monica, Pasadena, Hawthorne, Redondo Beach, West Covina, Santa Fe Springs, Corona, Fountain Valley, Stockton, Petaluma, Sunnyvale, Campbell, Fresno, San Leandro, Bakersfield, Orland, Riverside, Santa Barbara, Santa Maria, Santa Rosa, Yuba City, Westminster and Orange.[5]

Notably, the offered declarations also demonstrate why it was impracticable for the Angelhearts' attorneys to have "proved" these "significant public benefits" at the time of the hearing on the attorney fee award. The "Zoning Project" in Los Angeles County did not even come into existence in Los Angeles County until well into 1990 and as of the present time is less than a third of the way through its review of local ordinances in this county. Likewise, the other presentations before city councils, negotiations, lawsuits and related activities capitalizing on *Angelheart* started after the attorney fee award hearing. All of these events were reasonably predictable but not "provable" as of the time of the hearing. Now, of course, they are not only predictable but proved.

The majority of this court, however, over my dissent has denied the section 909 motion to accept these declarations as evidence or as justification for taking additional evidence in any form on the question of whether the Angelhearts' lawsuit and decision conferred a "significant public benefit.[6] Accordingly, these declarations are not admitted evidence in this appeal. Nonetheless, they exist in the nature of "offers of proof" that a "realistic assessment of all the pertinent circumstances" as of the time of the hearing in the trial court and as of the time the appeal was heard in this court should have included the reasonably foreseeable impact the *Angelheart* case would

and protect the rights of their clients. . . . [T]he pleadings and briefs from *Angelheart et. al. vs. the City of Burbank* have been the cornerstone of child care advocacy in Orange County and has provided important authority for advocates in their efforts to bring city ordinances into compliance with State law." (Declaration of Kristine Adams-Charton in Support of Motion for Reconsideration, executed on July 31, 1991, at pp. 2-3.)

[5]The declarations cited in the preceding footnotes mentioned these specific jurisdictions. They also referred to many other jurisdictions where the Angelheart litigation was used to persuade or compel compliance, but did not name those cities and counties.

[6]It is true these declarations were not submitted until the Angelhearts filed their petition for rehearing. But it should be recalled they were the respondents in this appeal. The trial court had found, correctly I believe, that the benefits conferred solely on Burbank's citizens were "significant" enough by themselves to satisfy the standards of section 1021.5. Accordingly, the Angelhearts had no reason to attempt to document the benefits their lawsuit had conferred beyond the boundaries of Burbank until the majority filed its opinion. Thus, the Angelhearts' motion under section 909 was not only proper—and the accompanying declarations material and convincing evidence—but this motion was timely in the circumstances of this case.

have in jurisdictions outside Burbank. It was predictable this litigation would confer "significant public benefits" in Los Angeles County and elsewhere throughout the state. The offered declarations merely confirm that it has.

If the majority is concerned these declarations do not capture the full reality I would happily join them in remanding the case to the trial court—or in appointing the trial court as a referee—to consider this and other evidence on the question of whether the *Angelheart* decision and the Angelhearts' lawsuit indeed has conferred "significant public benefits" beyond the boundaries of Burbank. On the other hand, I am unwilling to join my colleagues in denying reality.

To sum up, I conclude the trial court's finding of a "significant public benefit" should be upheld. Even if we focus solely on benefits to the citizens of Burbank the amount of benefit is sufficiently significant to satisfy the standards of section 1021.5. And if we *realistically* assess *all* the pertinent circumstances, as prior opinions instruct, we discover this case in all probability has conferred and will continue to confer benefits on citizens in many other cities, large and small, throughout the State of California. With these further benefits factored in, it is undeniable this plaintiffs' legal action fulfilled the "significant public benefit" requirement. Accordingly, in my opinion, there is no question but that this court should have affirmed an attorney fee award to the plaintiff under the terms of section 1021.5.[7]

## II. The Trial Court Erred in Calculating the Amount of Attorney Fees Awarded.

Once it has been established the plaintiffs' litigation satisfied all the applicable requirements of section 1021.5 and the party is entitled to attorney, fees the remaining question is whether the trial court's calculation of attorney fees was correct. In the instant case it was not.

---

[7]The majority opinion does not reach nor challenge the trial court's implicit finding the plaintiff satisfied the "financial burdens of private enforcement" requirement of 1021.5(b). This requirement is fulfilled when "the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' " (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71], quoted with approval in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 941 [154 Cal.Rptr. 503, 593 P.2d 200].) Suffice it to say, this plaintiff clearly lacked the resources and did not have enough to gain in personal monetary terms to incur the legal expense (perhaps in excess of $50,000 and no less than $15,000) required to prosecute this case to a successful conclusion. Indeed, this plaintiff would have been unable to litigate this case had there not been a "public interest" law firm such as this available to undertake cases of this nature without expecting a fee from the client.

The amount of the award is to be determined according to the guidelines set forth by the California Supreme Court in *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48-49 [141 Cal.Rptr. 315, 569 P.2d 1303]. (*Serrano III.*) *Serrano III* requires the trial court to first determine a "touchstone" or "lodestar" figure based on a "*careful compilation* of the time spent and reasonable hourly compensation for each attorney . . . involved in the presentation of the case." (*Id.* at p. 48, italics added; *Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 625 [186 Cal.Rptr. 754, 652 P.2d 985] (*Serrano IV*).) The lodestar figure may then be "increased or reduced by the application of a 'multiplier' after the trial court has idered other factors concerning the lawsuit."[8] *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704].)

The court in *Serrano III* held the determination of the lodestar figure to be extremely important. Accordingly, the court stated, " 'The starting point of every fee award . . . must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' " (*Serrano III, supra,* 20 Cal.3d at p. 48, fn. 23, quoting *City of Detroit* v. *Grinnell Corp.* (2d Cir. 1974) 495 F.2d 448, 470.)

The court in *Serrano III* acknowledged it is the trial judge who ultimately has discretion to determine "the value of professional services rendered in his [or her] court . . . ." (20 Cal.3d at p. 49.) However, the court added, the determination of the lodestar figure is so "fundamental" in calculating the amount of the award, the exercise of discretion must be based on the lodestar adjustment method. (*Id.* at pp. 48-49.)

In the instant case the plaintiffs submitted a lodestar figure of about $56,000 and requested the figure to be multiplied by a factor of 1.25 for a total of $71,286.62. The application of the multiplier was based on certain factors such as the relatively low-income status of plaintiffs, the unpopular and expensive nature of suing a municipality, and the skills displayed by counsel in obtaining the exact relief sought.

---

[8] A number of factors were set forth by *Serrano III* which the trial court may consider in adjusting the lodestar figure. Among these factors were: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing lawsuits of the character here involved; (6) the fact that the monies awarded would inure not to the benefit of the attorneys involved but the organizations by which they are employed." (20 Cal.3d at p. 49, fn. omitted.)

In the ruling the trial court did not make findings regarding the lodestar figure or engage in a *Serrano III* analysis of the various factors which might justify the modification of the requested sum. Instead, the court devised its own arbitrary formula for determining the amount of fees awarded. The trial court stated it felt the 441.74 attorney hours claimed was an "incredible accumulation" of attorney hours (for attorneys) of "their asserted competence and experience" and the work "*should have*" been produced in no more than 150 hours—50 hours less than counsel representing the City of Burbank spent. Thereafter, using the hourly rate of $125, the trial court awarded plaintiffs $18,700. (150 multiplied by $125 equals $18,750.) This award is less than one-third of the amount claimed.

There was no "careful calculation" of hours. The trial court did not question that plaintiffs' attorneys actually devoted to this litigation the number of hours they claimed to have. The court merely stated in ballpark terms the amount of time it felt the attorneys *should* have needed to do the work in. With no explanation or justification of the reduction the court cut the number of hours by two-thirds. Somehow these lawyers were expected to research, draft pleadings, prepare legal arguments and briefs, and all the rest required to create and litigate a lawsuit on an issue no one had litigated before and to do so in 50 hours less than Burbank's lawyers took merely to *respond* to contentions plaintiffs' lawyers had to *create*.

On its face, this appears to be an unjustified "ball park" reduction in the hours allowed for this litigation. Had the trial court identified which specific items of legal work appeared to have required excessive hours to complete and by how much, this appellate court might be in a position to meaningfully review the trial court's findings, and agree with all or some of those findings. But 150 hours does not appear an adequate allotment for a case of this nature which was resisted as vigorously and at as many stages and in as many forums as this one was.

Not only did the court arbitrarily pick the amount of hours it also arbitrarily chose an hourly rate of $125 which is substantially below what these attorneys traditionally charged. It did not justify this reduction in hourly rate in any way. In this day and age, $125 does not appear to be a fair and reasonable rate for lawyers of this level of experience and competence.

The California Supreme Court has held, "while a trial court has discretion to determine the proper amount of an award, the resulting fee must still bear some reasonable relationship to the lodestar figure and to the purpose of the private attorney general doctrine." (*Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at p. 324.) In the instant case there was absolutely no relation between the lodestar figure and the amount of fees awarded. There is no

"objectivity" when a court determines the issue decided in the case "doesn't really contemplate $50,000 attorney fee bills" and then cuts the amount of the attorney fees by two-thirds because the trial court holds an opinion the case was of limited importance. It is improper to intertwine the "determination of the litigation's importance with the question—which should arise only after it has been concluded that an award is proper—of the amount to be awarded." (*Id.* at p. 323.)

What the trial court did here is improper. As expressed in its own rationale, the court was treating this as if section 1021.5 created some sort of "quasi contingent fee" arrangement—the amount of the fee awarded to be proportional to the judge's perception of the importance of the issue or the amount of the public benefits conferred. Instead, under section 1021.5, once the issue is important enough and the benefits conferred significant enough to pass over the statutory threshold, the *amount* of the fee award depends solely on the amount of legal work required to litigate the case that produced those benefits adjusted by a multiplier. In deciding the amount to be awarded only the factors set out in footnote 2, *ante,* should be considered. The calculation devised by the trial court did not follow the guidelines set in *Serrano III* nor did it account for the *Serrano III* factors. Instead the calculation was infected by the trial judge's view of the results achieved.

III. THIS IS A PARTICULARLY APPROPRIATE CASE IN WHICH TO REQUIRE A LOCAL GOVERNMENT TO PAY THE PLAINTIFFS' FULL ATTORNEY FEES. TO FAIL TO DO SO IN CASES OF THIS NATURE NOT ONLY WILL DENY COMMON CITIZENS THE ACCESS TO JUSTICE WHICH SECTION 1021.5 WAS DESIGNED TO AFFORD BUT COULD GRANT LOCAL GOVERNMENTS IMMUNITY FROM STATE LEGISLATIVE MANDATES DESIGNED TO BENEFIT THOSE COMMON CITIZENS.

At oral argument, Burbank made a fervent plea against allowing an attorney fee award in this case, in effect characterizing plaintiffs' request as a raid on the public fisc. Why should Burbank taxpayers have to pay lawyers who sued Burbank? And, especially, why should the city's taxpayers have to pay "so much" to those lawyers?

The answers to both those questions are obvious in the purposes of the private attorney general doctrine which was codified in section 1021.5 and the behavior of the City of Burbank government in this case. Indeed, the instant case illustrates perfectly why that doctrine came into existence and was eventually codified by the California Legislature. Here that Legislature passed a law to effectuate a critically important public goal, the expansion of desperately needed child care facilities in this state. The law expressly stated this statewide public goal was so important it superseded local land use

regulations which might otherwise limit the size of home child care facilities. Despite the clear language of this state law and its underlying public policy, Burbank, among other jurisdictions, insisted on retaining and enforcing old land use restrictions which directly conflicted with the state code.

At considerable cost to the state treasury the State Attorney General's Office might have initiated a series of enforcement actions against Burbank and other counties and municipalities compelling them to change their zoning regulations to bring them into compliance with the new state laws. But the State Attorney General's Office has limited resources and many laws to enforce. So those local restrictions remained on the books in Burbank when plaintiffs applied to expand their home child care center as permitted —indeed as encouraged—by the California Legislature. Even then, Burbank could have chosen to comply with state laws and simply not enforced the superseded land use restrictions. But instead the city elected to deny plaintiffs their rights under state law to operate a 12-child home care facility.

If home child care was a different sort of enterprise it might not have been necessary for the Angelhearts to take Burbank to court. For instance, were this a land-use regulation adversely affecting the grocery business in violation of a new state law, "Mom and Pop" stores could sit back and wait for one of the major "chains" in the food business to file an action compelling the city to comply with the state code. These chain stores have enough at stake and enough money in the bank to finance this litigation themselves without resort to section 1021.5. But by its very nature, the home child care field has no large "chain" operations. Rather it consists of small—very small—businesses operated in the owners' homes. It would be impossible for them to be able to afford the legal fees required to sue a recalcitrant city like Burbank. It will be five or ten years or possibly more before the Angelhearts earn enough additional profit from the expanded clientele in their home child care facility to amass the more than $50,000 in legal work required to force Burbank to abide by the clear mandate of California state law.

What this means, of course, is that were it not for the private attorney general doctrine codified in section 1021.5 city governments like Burbank could ignore state laws when the only ones affected by those laws are small businesses or modest income citizens like the Angelhearts.

Thus the answer to the question of why Burbank taxpayers should have to pay the Angelhearts' legal fees is obvious: This is the only practical way Burbank's government can be brought into line with state law. For that

reason, it is the only way to enforce the public right which state law created for the Angelhearts and other citizens located in Burbank and similar jurisdictions. To deny the Angelhearts' their court awarded fees under section 1021.5 in this case will mean that in the future other small businesses and modest income individuals will be hard pressed to find lawyers willing to represent them in actions compelling local government to comply with state laws.

As to the question why Burbank's taxpayers should have to pay legal fees in the neighborhood of $50,000 to $70,000 that, too, has an easy answer. The blame falls squarely at the feet of the Burbank government. If Burbank had obeyed the new state law at the outset there would have been no legal fees to pay at all. The superseded local land-use restrictions would have been amended or ignored and the city would have granted the Angelhearts their permit immediately. Having failed to abide by the law at the beginning, there were many other opportunities during the enforcement process that followed for Burbank to stop resisting the inevitable. If it had, the Angelhearts' lawyers would not have had to spend so much time litigating this lawsuit and their bill would have been smaller. The Angelhearts' expenditures grew in direct proportion to Burbank's stubbornness.

The facts which have emerged during this appeal serve to underscore a truism—the right to vote has little value to those who lack access to legal counsel. Voters can elect the legislators who will enact the laws that give them rights. But more often than not those remain rights in theory and not in practice. It is only when these same voters are able to obtain legal counsel that the theoretical rights become real. For, under our system of government, only then can those citizens pursue a lawsuit to compel obedience to the laws which provide the rights.

Here, elected representatives created new statutory rights for the Angelhearts and thousands of other voters. Those rights were not self-executing, however. As is too often true, others in society—this time city governments one might expect to be more obedient to state law—refused to honor the new rights voluntarily. In this case the Angelhearts were very fortunate voters. They were able to find lawyers willing to undertake an expensive, pathbreaking lawsuit without charging them the cost of that representation. The lawyers did so in the hope, if successful, they could recover attorney fees under section 1021.5. Without this special dispensation, the state statutes the Angelhearts' right to vote helped make possible would have had no more

meaning for them than a worthless scrap of paper.[9] Less fortunate are the multitudes of other small businesses and modest-income individuals—to say nothing of poor people—who need to mount a lawsuit of this nature and cost in order to enforce the otherwise purely theoretical rights their elected officials have enacted in hundreds of other statutes. Under the majority's application of section 1021.5, they will remain disenfranchised—not of their right to vote, but of their right to make that vote meaningful.

The majority opinion, thus, has two unfortunate consequences. First, the criteria it applies deny small businesses and modest income individuals the opportunity to vindicate important public rights intended to benefit them and others in society. Secondly, these same criteria allow local governments to ignore state mandates when those laws only benefit small businesses or others whose resources and economic interests are inadequate to pay for lawsuits to compel obedience.

For the reasons set forth earlier in this opinion, I would affirm the case insofar as it establishes plaintiffs are entitled to an award of fees under section 1021.5. As to the amount awarded, however, I would reverse the judgment and remand for further proceedings consistent with *Serrano III*.

A petition for a rehearing was denied August 14, 1991, and the petition of plaintiffs and appellants for review by the Supreme Court was denied October 24, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

[9]If we were to consider the declarations offered by leaders of several pro bono law firms, it apparently has taken legal representation and often lawsuits to enforce this new statutory right in most local jurisdictions throughout the state. (See fns. 3-5, *ante*.) Thus, pro bono programs have been forced to divert limited resources donated by volunteer lawyers to persuade or compel these reluctant cities and counties to obey a statewide mandate. Inevitably, this means other citizens with other cases must be denied legal help by these volunteer lawyers. Their rights remain unenforced and thus nonexistent.